## Albright, Appellant, *v.* Albright.

*Equity—Contracts—Vagueness of terms—Ownership of business—Profits—Accounting.*

1. It is not the function of the court of equity to make a contract for the parties or to supply any material stipulations of a contract alleged to have been made.

2. Where a bill in equity filed to obtain possession of a business and

for an accounting of profits avers ownership in the plaintiff and this is denied by the defendants who aver a sale of the business to them, and the court finds as a fact on sufficient evidence that there was no sale, although the parties "had reached some kind of an agreement for community of profits, but the evidence gave no indubitable basis for a conclusion as to the terms, because, as is probable, the terms were never fixed," the plaintiff is entitled to the relief prayed for including an accounting for profits, and there is no justification for a decree based on the assumption of the existence of an agreement by which the defendants were entitled to share equally with the plaintiff in the profits of the business.

3. There is no principle of law or equity which authorizes a court as remuneration for an employee's successful management to divide the business or profits arising therefrom between the employee and his employer.

4. A court of equity in dealing with legal rights adopts and follows the rules of law in all cases to which these rules are applicable; and whenever there is a direct rule of law governing the case in all of the circumstances, the court is as much bound by it as would be a court of law if the controversy was there pending.

Argued April 19, 1910. Appeals, No. 371, Jan. T., 1909, by plaintiff, from decree of C. P. No. 2, Phila. Co., March T., 1907, No. 4,210, in case of Chester E. Albright v. Chester E. Albright, Jr., and William L. Albright. Before FELL, C. J., BROWN, MESTREZAT, POTTER and STEWART, JJ. Reversed.

Bill in equity for an accounting and to obtain possession of a factory and business. Before SULZBERGER, J.

The facts appear in the opinion of the Supreme Court.

*Error assigned* was the decree of the court directing an accounting of profits between the plaintiff and the defendants.

*Alex. Simpson, Jr.*, with him *N. M. Edwards*, for appellant.—In this case the decree is in direct contradiction of every pleading, and, therefore, erroneous: Thompson's App., 126 Pa. 367; Zook v. Penna. R. R. Co., 206 Pa. 603; Luther v. Luther, 216 Pa. 1.

No equity can be built out of the fact that there was talk of a possible future interest to be given to defendants, and that they had made a great success out of a formerly very modest business: Little v. Dawson, 4 Dallas, 111; Hartman's App., 3 Grant, 271; Thompson v. Stevens, 71 Pa. 161; Leidig v. Coover, 47 Pa. 534; Zimmerman v. Rhoads, 226 Pa. 174; Magniac v. Thomson, 56 U. S. 281; Walters v. McElroy, 151 Pa. 549; Grant v. Seitsinger, 2 P. & W. 525; Tagg v. Bowman, 108 Pa. 273; Shearman v. Morrison, 149 Pa. 386; McNair v. Burns, 9 Watts, 130; Benevolent Order of Active Workers v. Smith, 1 Pa. Superior Ct. 1.

*John G. Johnson,* with him *Joseph W. Gross* and *Dimner Beeber,* for appellees.

OPINION BY MR. JUSTICE MESTREZAT, July 1, 1910:

This is a voluminous record and we have examined it with care. We do not think it necessary to refer to and discuss the testimony in the case as we are all of opinion that the evidence warranted certain findings of fact made by the court below which, under the pleadings, are controlling and do not justify its decree.

The bill avers substantially that for ten years prior to 1901, the plaintiff was engaged in the manufacture and sale of money purses or pocketbooks in Muncy, Pennsylvania; that in March of that year he removed his business to Germantown, in the county of Philadelphia, and there conducted it in the name of the Albright Purse Company and under his own personal supervision and attention until February 28, 1902, when he removed his residence to Lewisburg, Union county, Pennsylvania; that while he carried on the business at Germantown he employed his son, William, one of the defendants, to work in the factory at such wages as the plaintiff saw fit to pay him; that at the instance of the defendants and for the reasons set forth in the bill he continued the business at Germantown instead of removing it to Lewis-

burg, and on or about February 28, 1902, he placed its management and control in the hands of the other defendant, Chester E. Albright, Jr., with directions to pay to the defendant, William L. Albright, so long as he remained at work in said business, a fixed salary and such other amounts as in the judgment of the said Chester, Jr., would be necessary to comfortably keep and maintain the family of the said William; that from February 28, 1902, until April 4, 1907, the business was run and managed by Chester, Jr., for the plaintiff under the same name as theretofore in accordance with the understanding and terms made between the said Chester, Jr., and the plaintiff; that during all the time the business was under the management of Chester, Jr., William was employed in the factory where said business was conducted, as an employee of the plaintiff, and received his regular pay for his services; that on April 4, 1907, the defendants visited the plaintiff at his residence in Muncy, and William, in the presence of Chester, Jr., denied that the plaintiff was the owner of the business and alleged that it belonged to the defendants jointly, and asserted that the plaintiff had no authority or control over the business; that the plaintiff on April 5, 1907, was refused admission to the factory situate in Germantown, and that the defendants continue to refuse the plaintiff access to the factory and to his books of account and other records of the business. The bill prays for discovery and an accounting, and for a decree that the defendants surrender possession of the factory and business, together with books of account, etc., to the plaintiff.

The answer of Chester E. Albright, Jr., admits that the plaintiff was engaged in the business at Muncy; that he removed the business to Germantown and conducted it under the name of the Albright Purse Company and gave his personal supervision to and assisted in managing the business until about February 28, 1902, but denies that the plaintiff contemplated removing the business to Lewisburg in 1901 or 1902. It also admits that

the plaintiff employed William L. Albright in the factory from July, 1901, to January 20, 1902. The answer avers that the plaintiff prevailed upon the defendant, to take the business and relieve the plaintiff of the responsibility of it, and to give William employment; that it was agreed in consideration of the transfer of the assets of the purse company to the defendant at an inventoried price, the plaintiff was to have a royalty of three cents on each purse manufactured with a guaranty of $3,000 a year; that it was agreed that if the other defendant, William L. Albright, would stop drinking and give his time and skill to the business, he was to have his share in it and in the meantime to receive compensation for his services as an employee; that Chester E. Albright, Jr., has run and managed the business of the purse company since January 20, 1902, in accordance with the agreement of transfer; that William L. Albright, the other defendant, was employed as an employee of Chester E., Jr.

The answer of William L. Albright, the other defendant, admits that the plaintiff carried on the business at Muncy, removed it to Germantown, and that he gave his personal supervision to the business until it was turned over to the defendants on January 20, 1902. The answer avers that William had been employed by the plaintiff while he conducted the business in Germantown, but denies that the employment was at such wages as plaintiff saw fit and proper to pay him; on the contrary, it is alleged, the employment was based upon the fact that plaintiff had agreed with defendant to give him a one-half interest in the manufacturing business and a fixed salary in addition thereto, provided defendant would give his time, attention and skill to the same. It is averred that the defendant at the instance of the plaintiff gave up his private business to join the plaintiff in his business, and an agreement was made by which he was to have a one-half interest in the plaintiff's business together with a fixed salary for his services; that subsequently the defendants proposed to plaintiff that

if he would surrender and give up his business they would pay him for the exclusive right to manufacture and sell purses under the plaintiff's letters patent, a three cent royalty per purse, and would guaranty him a minimum royalty of $3,000 a year which was accepted; that from February 28, 1902, until April 4, 1907, the business was conducted by the defendants as their own, and the amount of the inventory and the royalty agreed upon was paid to the plaintiff; that William's weekly salary was paid and charged against his share of the profits; and that he had been recognized and treated by the plaintiff and Chester, Jr., as a one-half owner in the business.

It will be observed that the plaintiff avers in his bill he is the sole owner of the business and its assets; that Chester, Jr., in his answer, avers that the plaintiff has no interest in the business or its assets, but that he, by purchase from the plaintiff, has been since January 20, 1902, and is now the sole owner thereof, subject to an undefined interest which he may give to William L., who was Chester, Jr.'s, employee; that William's answer denies that the plaintiff has any interest in the business or its assets, avers that William was not an employee of Chester, Jr., but that he and Chester, Jr., by purchase, are the owners of the business and assets in equal shares. A cross bill was filed by each of the defendants in which they aver that the business was sold and transferred to both defendants. The answers contradict each other as to the ownership between the defendants, and Chester, Jr.'s, cross bill contradicts his answer.

The trial judge found upon sufficient evidence as follows: "The plain inference to be drawn from this testimony is that both Chester and William thought that they had a general understanding with their father that if things went on well, and William behaved properly, he, the father, would make the matter all right; that no definite or specific meaning had ever been assigned to this agreement, nor had any definite or specific terms ever been fixed on, except the tentative modern provisions for

William's immediate needs. . . . The very nature of the circumstances inhibited a specific contract, by reason of the fear that William, once in possession of rights, would prove intractable. . . . We find that in or about January, 1902, there were negotiations between the plaintiff and defendants which amounted no more than to this, namely, an understanding that if things went on right, and the defendants, by their skill, labor and attention, should promote the prosperity of the business, an equitable arrangement concerning its management and ownership would at some reasonable time in the future be made; that no specific terms for such future arrangement were agreed on, and that there was not then or at any other time an actual contract of sale of the business between the plaintiff and the defendants." The court in banc approved these findings and, in accordance with the proof, further held: "The main fact apparent from the adjudication is that the parties plaintiff and defendants had reached some kind of an agreement for community of profits. The evidence, however, gave no indubitable basis for a conclusion as to the terms, because, as is probable, the terms were never fixed."

Under these findings of fact, warranted by the evidence, and the pleadings in the case, the trial judge very properly held "that the failure to fix terms practically nullified the agreement so far as judicial interference is concerned."

The bill and answers presented a single and distinct issue between the plaintiff and defendants. The plaintiff averred that he was the owner of the business and its assets; the defendants averred the contrary and that the business and its assets had been transferred to them in 1901, for a consideration, and they were the sole owners. In the opinion of the trial judge and the court in banc, the defendants failed to sustain the averment in the answers that there was a contract by which the property was transferred to the defendants in 1901, and the court found that while there was some kind of an agreement

between the parties for a community of profits, the evidence did not disclose the terms of the agreement, "because, as is probable, the terms were never fixed."

Under these conclusions of the court below, the plaintiff was entitled to the relief prayed for in the bill. It being found that the business and its assets belong to the plaintiff and that the defendants had failed to support the averment of their answers that the business had been transferred to them or that the title had passed from the plaintiff and that he was not the owner, and, further, that the terms of the agreement for a division of the profits had not been shown, it was the duty of the court to award an accounting and to enter a decree placing the plaintiff in possession of the property.

The learned court below, however, while conceding that "the plaintiff is the owner of the property, the chattels and machinery, and is entitled to an account of them," held that "the broad general principle is that equality is equity, and where equality is consistent with the main general purpose of an agreement of this kind, equity will assume its existence even without the best evidence, the dilemma being either to nullify in toto an agreement which was certainly reached or to supply terms by general equitable considerations." This is certainly an anomalous proposition, whether it be viewed from a legal or an equitable standpoint. The court concedes that while the property belongs to the plaintiff and that the defendants have shown no contract or agreement by which the title passed out of him and became vested in the defendants, that equity will assume the existence of some kind of an agreement by which the defendants have become entitled to share equally with the plaintiff in the net earnings of the property. The court seems to base this "equity" on "the successful and highly profitable work of their (defendants') period of activity;" and to hold that by reason of this success defendants "must take a share of the capital created by them and of the net earnings." It is then stated in the opinion: "In es-

timating this share we must regard the three parties as
standing upon a footing of equality, the plaintiff contrib-
uting the patents, the defendants developing and market-
ing the invention, and securing a good-will in the com-
mercial community." This division of the earnings of
the plaintiff's property is to be made without his consent
and in face of the express finding of the court that the
evidence gave no indubitable basis for a conclusion as to
the terms of an agreement for community of profits.

The learned court cites no authorities, and we appre-
hend there are none, which hold that it is the function
of a court of equity to make a contract for the parties
or to supply any material stipulations of a contract al-
leged to have been made by the parties. Nor do we appre-
hend that there is any precedent in the books, which
would so far depart from reason, as to hold that equity
can take the property of one person and give it to an-
other against the owner's consent. If there is anything
settled in the administration of equity it is that a chan-
cellor will not only not make an agreement for the par-
ties, but will not enforce a contract unless it is complete
and certain in all its essential elements. The parties
themselves must agree upon the material and necessary
details of the bargain, and if any of these be omitted, or
left obscure or indefinite, so as to leave the intention of
the parties uncertain respecting the substantial terms of
the contract, the case is not one for specific performance:
Zimmerman v. Rhoads, 226 Pa. 174. Where the rights
of the parties are clearly defined and established at law,
equity will not interfere and change or unsettle those
rights, but in all such instances the maxim æquitas sequi-
tur legem is strictly applicable: Magniac v. Thomson,
56 U. S. 281. A court of equity, in dealing with legal
rights, adopts and follows the rules of law in all cases to
which those rules are applicable; and whenever there is a
direct rule of law governing the case in all its circum-
stances, the court is as much bound by it as would be a
court of law, if the controversy was there pending:

Mathews v. Insurance Co., 75 Ala. 85.   Equality is equality, but it is neither equality nor equity to deny to the owner his legal right to the earnings of his own property.   It is not and never has been the function of equity to divest the owner of his property, the title to which is vested in him by law.   Under the facts found in this case, the law places the title to the business and its assets in controversy in the plaintiff, and equity will not and cannot interfere and deprive him of his property, or of its earnings.   Æquitas nunquam contravenit leges.

It may be conceded that under the management of the defendants, the business was highly successful, much more so than when the plaintiff himself conducted it, but this does not invest a court of equity with the power to divide the profits arising from the successful management between the owner and his employees who have managed it.   They may be entitled to compensation for their services like any other employee or agent engaged in the transaction of his employer's or principal's business, but there is no principle of law or equity which authorizes a court, as remuneration for the employee's successful management, to divide the business or profits arising therefrom between the employee and his employer. The court having found that the plant or business was owned by the plaintiff, and not by the defendants, as alleged by them, the former was entitled to an accounting, and to the possession of his property.

The issue made by the pleadings in the case was simple and distinct and the findings of fact by the court, noted above, fully supported by the evidence, sustained the right of the plaintiff to a decree in his favor.

The decree is reversed and an accounting by the defendants ordered.