J-A07009-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| TELETRACKING TECHNOLOGIES, INC., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| FRANK J. GORI, MARK JULIANO, GENE NACEY, LORRAINE NACEY, STEPHEN P. NASH, BRIAN E. SCHULIGER, INSIGHT VENTURE MANAGEMENT, L.L.C. AND INSIGHT TTT, LLC, | |
| Appellees | No. 940 WDA 2014 |

Appeal from the Order Entered June 6, 2014
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD 11-006531

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MUNDY, J.

DISSENTING MEMORANDUM BY BENDER, P.J.E.:      **FILED MAY 28, 2015**

Respectfully, I dissent.  Teletracking Technologies, Inc. (the Company) asserts the trial court erred in its interpretation of a corporate shareholder agreement and improperly imbued a question of law with equitable considerations.  The learned Majority deftly sidesteps these assertions, offering no legal counterpoint to the Company's arguments and citing in support of its affirmance precedent of dubious value.

The interpretation of a contract presents a question of law, and our review is *de novo*.  ***Lesko v. Frankford Hosp. – Bucks Cnty.***, 15 A.3d 337, 342 (Pa. 2011).

[W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone.  It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.  Hence, where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended.

*Id.* (quoting **Steuart v. McChesney**, 444 A.2d 659, 661 (Pa. 1982)) (emphasis in original).

According to the Company, the Shareholder Agreement provisions are clear and unambiguous.  Its argument is simple: Pursuant to Section 1(c) of the agreement, a selling shareholder must complete the sale of stock, pursuant to a *bona fide* offer, within 120 days of its presentation to the Company.  Thereafter, if closing is not completed, the offer must be re-presented to the Company and re-subjected to the first refusal process.  This Court previously determined that the Insight offer was *bona fide* and presented to the Company on March 31, 2011.  Therefore, according to the Company, the Minority Shareholders were required to complete the sale by July 29, 2011 (120 days later).  The Company acknowledges that, at that time, litigation was ongoing, but asserts that litigation did not necessarily impede closing on the sale.  Moreover, according to the Company, the Minority Shareholders should have sought to preserve the *status quo* pending appeal.  As they did not, the Company concludes, the plain meaning of the Shareholder Agreement controls, and the Minority Shareholders must re-submit the Insight offer.

I agree with the Company's arguments regarding the clear and unambiguous provisions of the Shareholder Agreement and that the Minority Shareholders did nothing to preserve the *status quo* during this litigation. Indeed, the Minority Shareholders argued *against* preserving the *status quo* in the context of the Company's prayer for injunctive relief.[1]  Thus, pursuant to the Shareholder Agreement, the Minority Shareholders were required to complete the sale of their stock to Insight by July 29, 2011.  They did not. In my view, therefore, they must re-submit the Insight offer and initiate the first refusal process anew.

The Minority Shareholders are sophisticated investors, represented by counsel, who presumably determined to pursue a strategy that would best meet their objectives.  Nevertheless, if they had preserved the *status quo* pending the Company's initial appeal, it is likely that this case would not now be before the Court.  **See** Pa.R.A.P. 1701(b)(1); **see also** Pa.R.A.P. 1732. To be blunt, the Minority Shareholders had their day in court; they won the day but failed to protect their victory.

The Majority does not dispute the legal interpretation of the Shareholder Agreement, echoing instead the equitable considerations voiced

---

[1] On June 5, 2013, long after the closing deadline had passed, the Minority Shareholders filed a motion to preserve the *status quo* pursuant to Pa.R.A.P. 1701.  However, the intent of this motion was to secure the disclosure of certain financial statements and to prevent the disposition of Company assets.  **See** Minority Shareholder's Motion, 06/05/2013, at 6.

by the trial court.[2] However, "it has long been the rule in this Commonwealth that in dealing with legal rights, a court of equity follows and is bound by rules of law, and does not use equitable considerations to deprive a party of his rights at law." ***Bauer v. P. A. Cutri Co. of Bradford***, 253 A.2d 252, 255 (Pa. 1969) (citing ***Albright v. Albright***, 228 Pa. 552, 560-561, 77 A. 896, 898-899 (1910)). In my view, we should not engage in equitable considerations absent a material breach of the underlying contract or some egregious behavior, such as fraud.

The Majority simply ignores this fundamental rule, implicitly adopting and extending the analysis of the trial court. For example, the trial court specifically determined to equitably toll the 120-day closing period, based upon its determination that the Company's "obstinate behavior" had frustrated the purpose of the Shareholder Agreement, citing in support ***LJL Transp., Inc. v. Pilot Air Freight Corp.***, 962 A.2d 639 (Pa. 2009). ***See*** Trial Court Opinion at 5-7. Although not addressed in detail in its Memorandum, the Majority seemingly endorses this view. ***See*** Majority Memorandum at 8 (suggesting that the Company used the 120-day closing period "as a sword, rather than a shield.").

In ***LJL Transp.***, a franchisee engaged in repeated, fraudulent conduct, thus breaching its franchise agreement. ***See LJL Transp.***, 962 A.2d at 642-

---

[2] Notably, the Minority Shareholders do not dispute this legal interpretation either.

On appeal, the Pennsylvania Supreme Court considered "whether a party's conduct in *breaching* a contract may justify its immediate termination, even if the contract includes an express provision granting the breaching party the right to cure before the contract is terminated." *Id.* at 641 (emphasis added). The Supreme Court concluded that a material breach causes the "contractual relationship to essentially evaporate." *Id.* at 652. Under such circumstances, the non-breaching party need not adhere to the contract's terms. *Id.*

Clearly, **LJL Transp.** is inapposite. Mere obstinacy, or the zealous pursuit of contractual rights, does not equate to fraud, nor will it constitute a breach. Here, the Minority Shareholders have made no allegation of breach or fraud, *nor has any court found evidence thereof*. Thus, there is no basis on which to conclude that the Company has frustrated the purpose of the shareholder agreement, and therefore, has no authority to delve into equitable considerations depriving the Company of its rights at law. In my view, the Majority's tacit acceptance of the trial court's analysis is inappropriate.

The Majority also suggests that the Company prevented the Minority Shareholders from performing under the contract, thus excusing their nonperformance, citing in support **Iron Trade Prods. Co. v. Wilkoff Co.**, 116 A. 150 (Pa. 1922). **See also** Minority Shareholders' Brief at 18-20

(asserting the prevention doctrine). I disagree.[3] Application of the prevention doctrine requires "wrongful acts" that "prevent performance required by the other party." *In re Scott*, 82 B.R. 760, 762 (Bankr. E.D. Pa. 1988) (applying Pennsylvania law). "*Mere difficulty of performance will not excuse a breach of contract.*" *Iron Trade Prods. Co.*, 116 A. at 151 (emphasis added).

None of the acts mentioned by the Majority persuades me that the prevention doctrine is applicable here. For example, the Majority quotes favorably from the trial court's personal attacks directed to the majority shareholder of the Company, who also serves as CEO and chairman, for his alleged efforts to prevent the Minority Shareholders from selling their shares. *See* Majority Memorandum at 7. In my view, such personal attacks are unwarranted. *See College Watercolor Grp., Inc. v. William H. Newbauer, Inc.*, 360 A.2d 200, 207 (Pa. 1976) ("The accepted rule in

_____

[3] The Majority's reliance upon *Iron Trade Prods. Co.* is curious. In that case, our Supreme Court actually rejected the defendant's argument that the plaintiff had prevented its performance. *Id.* at 151 ("Here plaintiff's conduct did not prevent performance by defendant, although it may have added to the difficulty and expense thereof."). The other precedent cited by the Majority is similarly curious. *See Goodwin v. Rodriguez*, 554 A.2d 6 (Pa. 1989) (*reversing* a trial court's equitable decision to permit a delinquent tenant to remain in a residence where eviction proceedings were based upon violation of a valid lease agreement); *Valora v. Pa. Emp. Benefit Trust Fund*, 939 A.2d 312, 319-320 (Pa. 2007) (recognizing that "the *doctrine of subrogation* has its origins in equity, not in contract law") (emphasis added).

Pennsylvania is that a corporation is an entity distinct from its shareholders even if the stock is held entirely by one person."). Here, we are faced with a dispute between a corporate entity and certain of its minority shareholders – nothing more.[4]

The Majority references corporate decisions to reject previous offers to purchase Company shares. In my view, the Company's opposition to previous offers presented by the Minority Shareholders *cannot be considered* on this record because there has been no finding, *by any court*, that the previous offers were *bona fide*. Absent such a finding, we simply have no basis upon which to malign the Company's prior actions.

The Majority also concludes that the Company's pursuit of its legal rights stymied closing on the Insight offer. **See** Majority Memorandum at 8-9. However, the basis of the Majority's conclusion - a provision in the purchase agreement between Insight and the Minority Shareholders that precluded closing while litigation was ongoing or threatened – is irrelevant. The Company was not party to the purchase agreement and is not responsible for its terms. Moreover, I am aware of no reason why Insight

_____

[4] I note further that the trial court's lengthy comparison of this person to Napoleon Bonaparte is rather grandiose. **See** Trial Court Opinion at 1-4; **see also** http://en.wikipedia.org/wiki/Napoleonic_Wars_casualties#cite_ref-3 (last visited May 7, 2015) (citing various estimates of the hundreds of thousands of dead and missing casualties of the Napoleonic Wars).

and the Majority Shareholders could not have modified any terms that rendered closing overly burdensome.

Finally, it is, of course, well settled that "no order can be made by a court in the enforcement of a judgment which would, in violation of 'due process,' take from a litigant substantive property rights[.]" ***Comm'rs of Sinking Fund of City of Phila. v. City of Phila.***, 188 A. 314, 317 (Pa. 1936). However, the trial court stands this precedent on its head, citing it in support of the court's decision to toll the closing deadline. ***See*** Trial Court Opinion at 7-9 (suggesting such was necessary to enforce the previous judgment). The underlying trial court order of May 26, 2011, declared the following substantive property rights: (1) the Insight offer was *bona fide* and (2) notification of the offer triggered the Company's matching rights and obligations as of March 31, 2011. These matching rights and obligations include the Company's right of first refusal and its right to have any *bona fide* offer settled within 120 days. ***See*** Shareholder Agreement at §§ 1(a)-(c). Thus, contrary to the trial court's analysis, the retroactive tolling of the closing deadline did not enforce a previous order but rather fundamentally modified substantive rights previously determined.

For these reasons, I would reverse the order of the trial court.