962 A.2d 639

LJL TRANSPORTATION, INC., Louis P. Pektor,
III, and Leo A. Decker, Appellants

v.

PILOT AIR FREIGHT CORPORATION, Appellee.

Supreme Court of Pennsylvania.

Argued April 16, 2008.

Decided Jan. 22, 2009.

Barry L. Cohen, Esq., Sunah Park, Esq., Ira Silverstein, Esq., Lisa Marie Swan, Esq., Thorp Reed & Armstrong, L.L.P., Philadelphia, for LJL Transportation, Inc., Louis P. Pektor, III, and Leo A. Decker.

Walter Weir, Jr., Esq., Daniel D. Haggerty, Esq., Edward T. Kang, Esq., Weir & Partners, L.L.P., Philadelphia, for Pilot Air Freight Corporation.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## OPINION

Justice TODD.

In this appeal, our Court is called upon for the first time to consider whether a party's conduct in breaching a contract may justify its immediate termination, even if the contract includes an express provision granting the breaching party the right to cure before the contract is terminated. For the reasons that follow, we conclude that Pennsylvania law permits the immediate termination of such a contract when there is a material breach of the contract so serious it goes directly to the heart and essence of the contract, rendering the breach incurable, and so we affirm the Superior Court's decision to that same effect.

LJL Transportation Inc. and its owners, Louis Pektor III and Leo A. Decker, ("Appellants") appeal the order of the Superior Court of Pennsylvania which upholds the order of the Court of Common Pleas of Northampton County granting summary judgment in favor of Appellee, Pilot Air Freight Corporation ("Pilot") on its counterclaim for breach of contract. Pilot is a company based in Lima, Pennsylvania and is engaged in the air-freight forwarding business which requires it to move, in an expedited fashion, heavy-duty freight shipments to various destinations throughout the country. Pilot accomplishes this by utilizing a network of both company-owned and company-franchised freight stations located at airports and other sites around the country. Each franchisee enters into a standard franchise agreement with Pilot which grants the franchisee: the use of the name and logo "Pilot Air Freight," an exclusive sales territory, and the right to receive operational, sales, and management services from Pilot. The agreement requires the franchisee to place all freight shipments with the Pilot Air Freight system, and specifically forbids the franchisee from conducting any other business from the franchised location unless given written authorization to do so by Pilot. The franchisee is also barred by the agreement from delivering any freight under the Pilot Air

Freight name which originates with another freight forwarder, and is prohibited from delivering under another carrier's name any freight which originated in the Pilot system.

The franchisee is required to report at the end of each business day all business it transacted during that day. Upon receipt of these daily business reports, Pilot prepares and sends invoices to the franchisee's customers, and then collects payment directly from the customers. After collecting the customer payment, Pilot deducts a royalty fee and other costs specified by the franchise agreement, and it forwards the remainder of the funds to the franchisee. Pilot relies wholly on the franchisee's representations of the accuracy of the information contained in the daily reports, since it is the only means Pilot has of knowing what business was transacted at a particular franchise location during the course of a given day.

LJL Transportation Inc. ("LJL"), is a Pennsylvania corporation owned in equal shares by Pektor and Decker. LJL became a franchisee of Pilot in November 1991 after it was assigned all contractual rights and duties of another Pilot franchisee, R & D Air Freight. The franchise agreement was for a 10–year period set to expire in November 2001. At the time of this assignation, both Pektor and Decker also executed a separate guaranty agreement with Pilot, agreeing to be personally bound by the terms and conditions of Pilot's franchise agreement. LJL was assigned two Pennsylvania territories, one in Allentown, and one in Harrisburg.

According to the findings of the trial judge, the Honorable F.P. Kimberly McFadden, which Appellants do not contest, and which were based on a wide array of evidentiary materials submitted by Pilot in support of its cross-motion for summary judgment,[1] in early January 2001, Pilot learned the following information from employees of LJL. Since 1999, Appellants had been deliberately and systematically diverting freight

---

1. These include sworn affidavits of a Pilot vice president, sworn affidavits of present Pilot employees who were also former employees of LJL, sworn depositions of an operations manager for LJL, Decker, Pektor, and a former part owner and employee of LJL, Robert Zisko, as well as party admissions and shipping invoices.

shipments, required under the terms of the franchise agreement to be shipped through the Pilot Air Freight system, to Northeast Transportation ("Northeast"), a separate trucking company which was a direct competitor of Pilot and which was owned by Pektor and Decker. In its opinion, the trial court recounted the deposition testimony of Decker in which he admitted he knew that all shipments which began or ended outside of LJL's territory had to be reported to Pilot and that LJL had failed to report a number of shipments for "pricing reasons." Trial Court Opinion, 12/9/03, at 9 (citing *Deposition of Leo Decker*, at 212–214, 235 (R.R. at 309a–311a)). The trial court also looked to the testimony of Robert Zisko, a former owner of a minority interest in LJL, and later an employee, who testified he was personally aware of $3,000 to $5,000 a month in business in 1999 which was deliberately not reported to Pilot so that LJL could avoid paying Pilot the franchise fee on the shipment and avoid splitting the profits of the shipment with it, thus enabling LJL to "make more money off the shipment." *Id.* (citing *Deposition of Robert Zisko*, 10/8/2003, at 30 (R.R. at 367a)). Zisko acknowledged such conduct was inappropriate. *Id.* at 43, (R.R. at 371a). The trial court additionally referred to the sworn affidavit of former LJL employee Jody Sutton, which attested to the fact that Decker specifically encouraged employees to run shipments through Northeast without entering them into the Pilot system by offering the employees bonuses to do so. Trial Court Opinion, 12/9/03, at 9. Pilot also presented documentary evidence to the trial court showing that LJL customers were billed for shipments sent through Northeast on forms and invoices bearing the Pilot trademark, and the sworn affidavit of an LJL employee which attested to the fact that LJL employees were prohibited from having direct communications with Pilot, which was characterized to the employees by Decker as "our enemy." R.R. at 257a, 323–327a. Upon learning of LJL's conduct, Pilot immediately sent a letter to Appellants, dated January 4, 2001, indicating it was terminating the franchise agreement.

Appellants responded by filing a complaint against Pilot in the Court of Common Pleas of Northampton County, asserting breach of contract and related causes of action. Pilot filed an answer and counterclaim, an amended answer and amended counterclaim, and, finally, a third amended counterclaim. In the third amended counterclaim, Pilot sought legal and equitable relief, raising a breach of contract claim against Appellants, as well as additional causes of action. Appellants subsequently moved for partial summary judgment on their breach of contact claim, contending that Pilot breached the franchise agreement by wrongfully terminating it without giving them a chance to cure their breaches since, in their view, the terms of the franchise agreement gave them an unqualified right to cure their breach. Pilot moved for summary judgment on its breach of contract claim as well, arguing that Appellants had no right to cure. Pilot maintained cure would be impossible under the circumstances due to the fact Appellants had engaged in dishonest and improper conduct, and the resulting breach of trust from that conduct frustrated the essential purpose of the agreement by rendering it "meaningless and worthless." Pilot Cross–Motion for Summary Judgment, 10/27/2003, at ¶ 19.

Based on its review of both motions and the aforementioned accompanying evidentiary materials, the trial court concluded Appellants admitted to engaging in conduct that breached the contract and had no defense to their actions. The trial court flatly rejected Appellants' sole assertion that they had an unqualified right to cure under a provision of the franchise agreement, paragraph 23(c), which provides:

*Cure.* This Agreement immediately terminates upon receipt by Franchisee of written notice of termination from Pilot. Pilot shall allow Franchisee an opportunity to cure a default within ninety (90) days of receipt of written notice of a particular default.

Pilot Franchise Renewal Agreement, 11/14/91, at ¶ 23(c). The trial court found Appellants were not guaranteed a right to cure by this paragraph because of the nature of their admitted conduct.

Failing to find any governing Pennsylvania precedential authority, the trial court observed that courts in other jurisdictions have found that the nature of the conduct by a breaching party can render obsolete the cure provisions of the agreement. Trial Court Opinion, 12/9/2003, at 7. The trial court noted the similarities of the conduct in this case to what transpired in *Southland Corp. v. Froelich*, 41 F.Supp.2d 227 (E.D.N.Y.1999), where the franchisee engaged in a scheme to withhold a percentage of revenue it was obligated under the terms of the franchise agreement to report to the franchisor. The trial court recounted that the court in *Southland* found the revenue sharing requirement in the parties' franchise agreement created an implied covenant in which the franchisee agreed "not to engage in schemes or gimmicks that deprive the franchisor of its percentage," and additionally found the franchisee had breached this covenant by hiding revenue from the franchisor. *Id.* at 8 (quoting *Southland*, 41 F.Supp.2d at 246–247).

Here, the trial court regarded the relationship between Appellants and Pilot to be "fundamentally the same" as that which existed in *Southland.* Trial Court Opinion, 12/9/03, at 8. The court determined the only way Pilot could ascertain the royalties properly due it under the agreement was to use Appellants' daily reports; thus, when Appellants, by their own admission, attempted to hide profit in order to keep it for themselves, they "breached a fundamental aspect of the contract." *Id.* The court therefore denied Appellants' motion for partial summary judgment, due to Appellants' admitted wrongdoing, in regard to which the court wrote:

> There was a cure provision, however there was also admitted dishonest conduct. . . . [T]he nature of the conduct in this case, particularly the failure of [Appellants] to report their revenues to Pilot as required, is enough to warrant [ ] Pilot in distrusting [Appellants], and thereby terminating their agreement.

*Id.*

In considering Pilot's cross-motion for summary judgment, the trial court again focused on the conduct of Appellants in

breaching the contract, namely, deliberately not reporting shipments to Pilot "for pricing reasons" so that Appellants "could make more money off the shipment" and offering bonuses to employees who would run shipments through Northeast and not Pilot. *Id.* at 9. The trial court accepted Pilot's argument that Appellants had no right to cure due to the "dishonest and untrustworthy nature of their actions." *Id.* at 10. In support of its decision to grant Pilot's motion for summary judgment, the trial court also cited *Larken v. Larken City Partner., Ltd.,* 589 N.W.2d 700 (Iowa 1998), in which the Iowa Supreme Court found that a management company, which had misappropriated rebates due under an agreement with a hotel owner, was not entitled to the opportunity to cure a breach of the agreement, despite provisions in the contract requiring notice to the defaulting party of the breach and an opportunity to cure. As discussed at greater length, *infra,* the Iowa Supreme Court determined the management company's acts of self-dealing were so serious they frustrated one of the principal purposes of the management agreement, and no adequate remedy for the breach existed since no amount of repayment of the lost funds could ever restore the lost trust of the franchisor. *Larken,* 589 N.W.2d at 704–705.

The trial court, finding the rationale of *Larken* and the authority cited therein persuasive, reiterated that because Appellants failed to honestly report daily business, this warranted a high level of distrust on the part of Pilot, since the only way that Pilot had of knowing the volume of business was based on daily reports submitted by Appellants' employees. The court determined such actions "directly offend[ ] the business agreement between the parties as well as the trust relationship between them." Trial Court Opinion, 12/19/03, at 10–11. The trial court thus granted Pilot's cross-motion for summary judgment.[2] Subsequently, Pilot voluntarily discontinued its remaining counterclaims, and Appellants lodged an appeal with the Superior Court.

2. Appellants had previously voluntarily withdrawn one of their other claims in their complaint, and the trial court also granted Pilot's cross-motion for summary judgment with respect to Appellants' remaining claims.

The Superior Court affirmed in a published decision authored by the Honorable Richard Klein. *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 905 A.2d 991 (Pa.Super.2006). The court noted with approval the cases relied on by the trial court, specifically the aforementioned *Larken* and *Froelich* decisions, as well as *Leghorn v. Wieland*, 289 So.2d 745 (Fla.Dist.Ct.App.1974), in which the Florida intermediate appellate court held that if an employee breached an employment contract by engaging in disloyal or dishonest conduct it would be impossible for the employee to remedy the breach or to expect the employer to continue to perform under it. Thus, the Superior Court held: "there are circumstances where the nature of the breach permits the aggrieved party to immediately terminate the contract despite a 'cure' provision." *LJL*, 905 A.2d at 992. The court rejected the argument of Appellants that they had an absolute right to cure any default, noting it "was rejected by the trial court, [and] has been rejected by every other state that has considered it, and we reject it as well." *Id.* at 993. Accordingly, emphasizing Appellants' deliberate diversion of business to a subsidiary to avoid paying royalties pursuant to its contract with Pilot, the court affirmed.

The court also dismissed, as waived, Appellants' alternative argument that Pilot could not show a substantial monetary loss due to Appellants' breach such that it could not be cured by Appellants' repayment of lost royalties. The court observed the issue was not raised before the trial court in Appellants' motion for summary judgment, and Pilot had no notice to defend on that issue. Moreover, the court opined that had the issue been raised, it was possible Pilot could have discovered and presented evidence of significantly more diversions than the $35,000 which it had uncovered. The court also noted this argument was not presented in Appellants' statement of matters complained of on appeal, filed pursuant to Pa.R.A.P.1925, and it was therefore waived for that reason as well. *Id.* at 993.

■ Appellants petitioned our Court for allocatur, which we granted to consider the following question:

Whether a breaching party's conduct may justify the immediate termination of a contract even where the contract includes an express provision granting the breaching party a period to cure its breach before the contract is terminated. *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 593 Pa. 332, 929 A.2d 640 (2007) (order).

Appellants presently renew the arguments they made to the lower courts that, even considering the nature of the particular conduct engaged in which constituted an admitted breach of the franchise agreement, they were, nevertheless, entitled under the terms of the agreement to notice and the opportunity to cure before Pilot terminated the contract by its letter of January 4, 2001. Appellants contend the franchise agreement is a contract under Pennsylvania law and, thus, is construed as all other contracts—to effectuate the plain meaning of all of its provisions, including termination provisions. Appellants maintain that rescission procedures specified in contracts must be strictly followed and, therefore, termination provisions of contracts must likewise be stringently adhered to if they are to have legal force. They suggest that a plain reading of the language of paragraph 23(c) of the franchise agreement establishes a mandatory requirement that Pilot give its franchisee an opportunity to cure a default within 90 days of written notice of the default whenever the franchisee engages in any of the conduct spelled out in paragraph 23(b).

Appellants assert the breaches they committed were all situations contemplated by the drafter of the franchise agreement and had been included among the specific grounds for termination enumerated in paragraph 23(b) of that agreement, which provides in relevant part as follows:

(b) *Termination by Pilot.* Pilot may terminate this Agreement upon the occurrence of any of the following:

\* \* \*

(vi) Franchisee fails to deal fairly and honestly with Pilot, suppliers, customers and to render to customers prompt, courteous and willing service;

(vii) Franchisee fails to offer all services required by Pilot or offers under the Pilot name or mark any service not authorized by Pilot, or Franchisee operates another business in conjunction with the franchised business;

(viii) Franchise[e] conducts himself in a manner that detracts from or brings into disrepute Pilot or the Pilot name or mark.

\* \* \*

(xvii) Franchisee fails to submit accurate invoices, daily business reports and other statements or documentation in such form and at such times as Pilot requires;

\* \* \*

(xxii) Franchisee picks up or delivers under a trade name or mark other than "Pilot" any freight originating within the Pilot franchise system, or moves freight outside the Pilot system;

\* \* \*

(xxix) Franchisee otherwise violates this Agreement.

Pilot Franchise Renewal Agreement, 11/14/91, at 22–24, ¶ 23(b). Appellants reason that because even bad and dishonest conduct fits within the category of occurrences enumerated in paragraph 23(b), Pilot was required to give them the opportunity to cure their default.[3]

Pilot counters by arguing Appellants' systematic scheme to defraud it could not be cured because it resulted in a destruction of the trust existing between the parties, which was a necessary component of their relationship as franchisor and franchisee, and constituted a breach of the fundamental essence and purpose of their contractual relationship. Pilot

---

**3.** Appellants further assert, as they did in the Superior Court, they could have cured their breach by repaying what they termed "the *de minimus* financial sums" owed Pilot from a diversion of the freight and by removing the individual responsible for the diversions. As discussed above, the Superior Court found this issue waived for the reasons cited in its opinion, and, regardless, it was not encompassed by our order granting review.

strenuously denies that the specific type of behavior in which Appellants engaged, systematic fraud and self dealing, was specifically contemplated by the termination provisions in paragraph 23(b) of the agreement, and asserts it would be absurd to believe it would anticipate that Appellants, as its franchisees, would deliberately create a competing business entity for the purpose of defrauding Pilot of revenues to which it was entitled under the agreement, and grant Appellants any right to cure if they engaged in such behavior. Pilot contends paragraph 23(c) of the franchise agreement did not prescribe the only remedy for Appellants' breach, and it directs our Court's attention to paragraph 30 of the agreement, which provides:

> Pilot's failure to insist upon strict compliance with any provision of this Agreement shall not be a waiver of its right to do so, any law, custom, usage or rule to the contrary notwithstanding. Delay or omission by Pilot respecting any breach or default shall not affect its rights respecting any subsequent breaches or defaults. **Pilot's election to exercise any remedy available by law or contract shall not be deemed a waiver of nor preclude exercise of any other remedy.**

Pilot Franchise Renewal Agreement, 11/14/91, at ¶ 30 (emphasis added). Pilot argues, as it did in the trial court, when these two paragraphs of the franchise agreement are considered together, it becomes clear the cure provisions of paragraph 23(c) are merely a cumulative remedy and not an exclusive one. Hence, Pilot maintains that under paragraph 30, it retained the right to rescind the contract without notice in the event of any breach of the covenant of good faith by Appellants which frustrated the purpose of the agreement. Because of the systematic nature of Appellants' scheme to defraud it of royalties rightfully due under the agreement, Pilot avers it would not have been reasonable to follow the cure procedure outlined in paragraph 23(c). Thus, Pilot argues, the decisions of the trial court and Superior Court were founded on and consistent with the well established body of

common law that recognizes there is dishonest conduct so egregious that cure is simply not possible.

We begin our analysis by noting our Court's well settled standard of review of the trial court's entry of summary judgment. An order of a trial court granting summary judgment may be disturbed by an appellate court only if the court committed an error of law, *Capek v. Devito,* 564 Pa. 267, 270, n. 1, 767 A.2d 1047, 1048 n. 1 (2001); thus, our standard of review is *de novo,* and our scope of review is plenary. *401 Fourth Street Inc. v. Investors Group,* 583 Pa. 445, 453, 879 A.2d 166, 170 (2005). The entry of summary judgment is proper whenever no genuine issue of any material fact exists as to a necessary element of the cause of action. *Sevast v. Kakouras,* 591 Pa. 44, 51, 915 A.2d 1147, 1152 (2007) (citing Pa.R.C.P. 1035.2(1)). The moving party's right to summary judgment must be clear and free from doubt. *Toy v. Metropolitan Life,* 593 Pa. 20, 34, 928 A.2d 186, 195 (2007). We examine the record, which consists of all pleadings, as well as any depositions, answers to interrogatories, admissions, affidavits, and expert reports, in a light most favorable to the non-moving party, and we resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Pa.R.C.P. 1035.1; *Washington v. Baxter,* 553 Pa. 434, 441, 719 A.2d 733, 737 (1998).

We have previously held "a franchise agreement is a contract to be interpreted under contract principles." *Mace v. Atlantic Refining Marketing Corp.,* 567 Pa. 71, 80, 785 A.2d 491, 496 (2001). In interpreting the language of a contract, we attempt to ascertain the intent of the parties and give it effect. *Crawford Central Sch. Dist. v. Commonwealth of Pennsylvania,* 585 Pa. 131, 143, 888 A.2d 616, 623 (2005). When the words of an agreement are clear and unambiguous, the intent of the parties is to be ascertained from the language used in the agreement, *Steuart v. McChesney,* 498 Pa. 45, 49, 444 A.2d 659, 661 (1982), which will be given its commonly accepted and plain meaning, *J.K. Willison, Jr. v. Consol Coal Co.,* 536 Pa. 49, 54, 637 A.2d 979, 982 (1994). Additionally, in determining the intent of the contracting parties, all provisions in the

agreement will be construed together and each will be given effect. *Murphy v. Duquesne Univ.*, 565 Pa. 571, 591, 777 A.2d 418, 429 (2001). Thus, we will not interpret one provision of a contract in a manner which results in another portion being annulled. *Capek*, at 274, 767 A.2d at 1050.

▮ Our Court has previously concluded that a party to a franchise agreement has an obligation to conduct itself with good faith and in a commercially reasonable manner. *See Atlantic Richfield v. Razumic*, 480 Pa. 366, 378, 390 A.2d 736, 742 (Pa.1978) (holding franchisor could not arbitrarily terminate franchise agreement as it would be a disregard of franchisee's interests under the agreement); *cf.* 13 Pa.C.S.A. § 1201(20) (defining good faith in the commercial context of the sale of goods as "honesty in fact and the observance of reasonable commercial standards of fair dealing."). Additionally, our Court has long recognized the established precept of contract law that a material breach of a contract relieves the non-breaching party from any continuing duty of performance thereunder. *Berkowitz v. Mayflower Securities*, 455 Pa. 531, 534–535, 317 A.2d 584, 586 (1974) (citing 6 Williston, *A Treatise on The Law of Contracts*, § 8[64] (3d. ed.1962)). It is equally well established, that "[a] party also may not insist upon performance of the contract when he himself is guilty of a material breach of the contract." *Ott v. Buehler Lumber*, 373 Pa.Super. 515, 541 A.2d 1143, 1145 (1988) (citing 17 Am.Jur.2d *Contracts* § 425; Murray, *Contracts* § 215 (2d. Rev Ed.1974)).

As the lower courts correctly recognized, however, there is no Pennsylvania caselaw directly governing the resolution of the particular question presented in this appeal: whether a party's conduct in breaching a contract may justify its immediate termination, even if the contract includes an express provision granting the breaching party the opportunity to cure before the contract is terminated. Thus, we look to other jurisdictions for guidance. Courts from other jurisdictions appear to be in accord that, unless the termination provisions of a franchise agreement are, by their terms, exclusive, a termination clause affording the right to notice and cure is, as

Pilot has suggested, merely a cumulative remedy which does not bar the non-breaching party from exercising other remedies available to it in the event of a breach by the other party going directly to the heart of the contract, and destroying the fundamental trust upon which the contractual relationship is built.

The seminal case on this point is *Olin v. Central Indus. Inc.*, 576 F.2d 642 (5th Cir.1978), which involved fraudulent conduct constituting a breach of a contract between a fertilizer manufacturer and a storage and distribution firm. Under the contract, the distributor agreed to operate a facility which would store and bag the fertilizer for shipment to the manufacturer's customers. The distributor was required to fill each bag to a weight of 50 lbs, plus or minus one half pound. The contract also contained a termination provision which provided that if either party were to default "in the performance or compliance with **any** of the covenants, agreements, terms or conditions" of the agreement, and the default continued for 90 days after the defaulting party received notice from the party not in default, then the party not in default could terminate the agreement after written notice, and after 120 days had elapsed from the date of the original breach. *Olin*, 576 F.2d at 647 (emphasis added).

Because of complaints by customers who repeatedly received under-filled bags of fertilizer from the distributor, the manufacturer commenced an investigation and discovered the distributor had been systematically "short weighting" the bags by filling each of them to less than 50 pounds. Evidence also showed that one of the partowners of the distribution company was stockpiling the leftover fertilizer, selling it on the side and pocketing the proceeds. The manufacturer, after learning of this conduct, provided the distributor neither notice of the breach, nor opportunity to cure, but, instead, brought suit in the federal district court of Mississippi seeking a declaration that the agreement was terminated. The distributor counterclaimed and obtained a directed verdict awarding it damages for breach of contract. The manufacturer subsequently appealed to the Fifth Circuit Court of Appeals. In that appeal,

the distributor asserted, as a defense to the manufacturer's claim of a unilateral right of termination, the failure of the manufacturer to provide notice and opportunity to cure in accordance with the termination clause of the contract. A panel of the Court of Appeals for the Fifth Circuit rejected that argument and reversed.

In its opinion, the court first noted that Mississippi followed the general principle of contract law that if a party commits a material breach of a contract, which is vital to the existence of the contract, then the breach will discharge the other party from further performance of that contract. *Olin*, 576 F.2d at 646–647 (citing 6 Williston, *A Treatise on the Law of Contracts* § 864 (3d. ed.1962); *Matheney v. McClain*, 248 Miss. 842, 161 So.2d 516, 519 (1964)). The Court next considered whether the notice and right to cure language of the termination clause of the parties' contract barred the manufacturer's right to unilaterally terminate that contract, since the manufacturer did not give the distributor the opportunity to cure its breach. The court explained that there were two competing views on the effect of such termination clauses in a contract: The "Corbin view," regarding a termination provision in an agreement as the exclusive means of terminating a contract;[4] and

---

4. This characterization was derived from the court's interpretation of Section 1266 of the 1962 edition of *Corbin on Contracts* which stated in relevant part: "The time and manner of exercising a power of termination may be specified in the contract; in such case an attempt to exercise it otherwise will be ineffective." Professor Arthur Corbin, *Corbin on Contracts* § 1266, at 65 (1962). However, in the 1997 supplement, the commentator discusses with approval the ultimate holding of *Olin*, which, as detailed *infra*, endorses the contrary proposition, namely that a party has the right to end an agreement because of a material breach, irrespective of a termination clause affording the breaching party the right to notice and cure, noting:

> The notice provision [of the franchise agreement] assumed that the breaches which would be used to terminate the contract would be *curable* breaches. There was a *frustration of purpose* when a breach involving fundamental dishonesty by one party occurred, because no amount of payment for past thefts by [the distributor] could ever restore the business trust and confidence which [the franchisor] wanted to have in its distributors.... Under the circumstances, then, [the distributor's] breach was a vital breach, it would have been sufficient to allow [the franchisor] to rescind the contract even if the contract had been in terms an absolute one for a fixed term *with no*

the "Williston view," which provides, "Unless a contract provision for termination for breach is in terms exclusive . . . it is a cumulative remedy and does not bar the ordinary remedy of termination for a breach which is material or which goes to the root of the matter or essence of the contract." *Olin,* 576 F.2d at 647 (citing, *inter alia,* Williston, *A Treatise on The Law of Contracts,* § 842, 165 n. 1 (3d. ed.1962)). The court deemed the *Williston* view as the most consistent with the law of Mississippi regarding the effect of material breaches, and likewise consistent with the policy embodied in its commercial code requiring good faith and honesty in the performance and enforcement of contractual relations. *Id.* at 648. Consequently, the court did not regard the termination provision in the parties' agreement to be controlling in the event of a material breach which substantially defeated the purpose of the contract.

Subsequently, in *Larken, supra,* the Iowa Supreme Court endorsed and followed the holding of *Olin.* In *Larken* the franchise agreement at issue between the hotel and its management company enumerated certain specific breaches for which no opportunity to cure need be provided, but required for all other breaches notice to the breaching party and an opportunity to cure within 30 days. The franchise agreement also contained a separate clause which provided that the requirement of notice and opportunity to cure after a default did not "preclude or impair the right of any party to exercise any right or remedy, whether for damages, injunction, specific performance, or otherwise upon any breach of any terms of [the franchise] Agreement." *Larken,* 589 N.W.2d at 702.

The *Larken* franchisee argued that because its self-dealing acts of entering into unauthorized contracts and misappropri-

*right of termination at all;* it seems strange to suggest that the right of immediate termination is lost because the parties expressly provided a means of terminating for lesser, curable breaches.

*Corbin on Contracts* § 1266, at 23 (Supp.1997) (emphasis original). In the most recent 2008 edition of that treatise, the commentator affirmatively clarifies that *Corbin* endorses *Olin's* holding as "correct and in accord with this treatise." 13 *Corbin on Contracts,* § 68.9, n. 5 (Rev'd ed.2003).

ating rebates were not specifically listed by the franchise agreement as breaches for which no notice or opportunity to cure was required before termination, the catchall notice and cure provision applied. Consequently, it contended its failure to receive notice and the opportunity to cure rendered the termination of the franchise invalid. The franchisor countered by pointing out the franchisee engaged in dishonesty that went to the very essence and fundamental purpose of the contract.

The Iowa Supreme Court agreed with the franchisor. Consistent with the teaching of *Olin,* the court rejected the view that the agreement's termination provision barred the franchisor from immediately terminating the agreement for the franchisee's material breach that struck directly the heart of the agreement:

> [T]he acts of self-dealing found by the district court were so serious that they frustrated one of the principal purposes of the management agreement, which was to manage the hotel in the best interests of the owner and to be honest and forthright in its dealings. Self-dealing is the antithesis of that purpose, and it violates the relationship of trust necessarily underlying such agreements.
>
> [The franchisee's] breach of its implied duty of honesty and fidelity went to the heart of the contract. Merely requiring [the franchisee] to retroactively undo its wrongdoing as [it] urges, would not be an adequate remedy As *Corbin* observed in discussing *Olin,*[5] "no amount of payment for past thefts by the franchisee could ever restore the business trust and confidence which the franchisor wanted to have in its distributors."

*Larken,* 589 N.W.2d at 704–705 (quoting *Corbin* § 1266, at 23 (Supp.1997)).

Courts in other jurisdictions have likewise concluded that, in the event of an incurable breach, the non-breaching party may immediately terminate the agreement without following its

---

5. For a discussion of the evolving views of the *Corbin* treatise on this point, see *supra* note 4.

notice and cure provisions. *See, e.g. Southland v. Mir,* 748 F.Supp. 969 (E.D.N.Y.1990) (actions of franchisees to deliberately understate volume of reported sales constituted a breach that went directly to essence of the contract such that termination was proper without resort to notice and cure provisions of the franchise agreement); *In re Best Film and Video,* 46 B.R. 861 (Bkrtcy.E.D.N.Y.1985) (despite notice and cure provisions, conduct of franchisee in unauthorized editing and showing of a film was so egregious as to constitute a vital breach of the agreement justifying immediate termination); *L.K. Comstock v. United Engineers,* 880 F.2d 219 (9th. Cir.1989) (despite notice and cure clauses, because subcontractor was so deficient in meeting performance requirements, there was no reasonable likelihood he could ever cure his breach of the contract, vitiating any notice and cure obligation on the part of the contractor).[6]

As one commentator observed, this is the prevailing approach to interpreting franchise agreements in the majority of jurisdictions which do not have contrary statutory provisions governing franchise termination:[7]

Under general contract law principles, it thus appears that, at least in most jurisdictions, a contractual provision requir-

**6.** The cases cited by Appellants in their brief, *see* Appellants' Brief at 31–32, in an attempt to demonstrate that courts of other jurisdictions will enforce cure periods of agreements, even in instances of incurable breaches, do not support this claim, nor do they contravene or contradict the great weight of authority previously discussed in this opinion. In *Manpower v. Mason,* 377 F.Supp.2d. 672 (E.D.Wis.2005), the court acknowledged the holdings of *Olin* and *Larken,* and did not question their viability; rather, the court found them inapplicable because the terminating party was not attempting to exercise its inherent right to end a contract for a breach that went to the essence of the contract, which the court recognized it had a right to do under Wisconsin law. *MCS Marketing v. University of Akron,* 2004 WL 2291430, (Ohio Ct.Cl. 2004) and *FINOVA Capital Corp. v. Richard A. Arledge, Inc.,* 2007 WL 1965335 (Arizona Dist. Ct. July 2, 2007) are similarly unhelpful to Appellants' position as neither of these unreported and non-precedential cases involved breaches that went directly to the essence of the contracts.

**7.** Pennsylvania has statutory provisions concerning termination of franchises for the sale of automobiles, malt beverages, petroleum products and motor vehicle accessories. *See* 63 P.S. §§ 818.8, 818.11–818.14, 818.15; 47 P.S. § 4–431(4); 73 P.S. § 202–3.

ing an opportunity to cure prior to termination does not bar immediate termination based on a breach that goes to the essence of the contract. These same principles can be applied to the franchise context. Most franchise agreements anticipate this precise issue by providing a notice and cure period for ordinary breaches, but permitting immediate termination for serious and incurable breaches. If for some reason a franchise agreement requires that an opportunity to cure be given for all breaches, without exception, a franchisor may still argue that it can terminate immediately for incurable breaches that frustrate the purpose of the parties' contract. In many cases, a material breach that cannot possibly be cured will be found to frustrate the purpose of the franchise agreement.

Jason J. Stover, *No Cure, No Problem: State Franchise Laws and Termination For Incurable Defaults*, 23 American Bar Association Franchise Law Journal 217, at 220 (Spring 2004).

■■■ Appellants nevertheless attempt to distinguish the aforementioned cases by arguing that the franchise agreement *sub judice* is unique in that it offers what it terms an unqualified right to cure, citing the use of the term "shall" in paragraph 23(c)—i.e., "Pilot shall allow Franchisee an opportunity to cure a default within ninety (90) days of receipt of written notice of a particular default." Pilot Franchise Renewal Agreement, 11/14/91, at ¶ 23(c). However, we must construe all of the provisions of the agreement together and in accordance with the ordinary and usual meaning of their written terms. *Murphy; J.K. Willison; Capek.* A plain reading of the entire agreement indicates that paragraph 23(c) is not the exclusive means by which the agreement could be terminated. To the contrary, paragraph 30 can be fairly read as an express reservation by Pilot of the right to exercise all remedies available to it after a breach of the agreement by LJL, including its inherent power to terminate the contract without notice in the event of a vital and essential breach. *Larken,* 589 N.W.2d at 702 (inclusion of additional clause

specifying parties retained other remedies at law and equity indicated notice and cure provisions of franchise agreement were not the only remedy available to a party in the event of a material breach).  Paragraph 23(c) must therefore be considered to be a cumulative remedy not an exclusive one.[8]  *Olin.*

In sum, we consider the rationale of *Olin* and *Larken* to be sound and in accordance with the law of this Commonwealth.  Consequently, we have no difficulty in concluding that when there is a breach of contract going directly to the essence of the contract, which is so exceedingly grave as to irreparably damage the trust between the contracting parties, the non-breaching party may terminate the contract without notice, absent explicit contractual provisions to the contrary. As *Olin, Larken,* and their progeny have correctly reasoned, requiring such notice before termination under such circumstances would be a useless gesture, as such a breach may not reasonably be cured.  *See also Leghorn* 289 So.2d at 748 (disloyal and dishonest conduct by a party to a contract is an incurable breach which excuses future performance by the non-breaching party).  Such a breach is so fundamentally destructive, it understandably and inevitably causes the trust which is the bedrock foundation and veritable lifeblood of the parties' contractual relationship to essentially evaporate.  We find our law does not require a non-breaching party to prolong

---

**8.**  Contrary to Appellants' suggestion, the cases of *Wright v. Bristol Patent Leather,* 257 Pa. 552, 101 A. 844 (1917), and *Accu–Weather v. Prospect Communications,* 435 Pa.Super. 93, 644 A.2d 1251 (1994), do not compel a different result.  In both cases, the parties attempting to terminate their obligations under agreements were not doing so because of any egregious or fraudulent conduct of the other contracting party, which constituted a vital and essential breach of the contract. Instead, they were attempting to terminate their agreements because they no longer wished to be bound by them, but they failed to comply with the specified procedures for termination set forth in the agreements.  Consequently, in both cases, the attempted termination was held to be invalid for noncompliance with the terms of the agreement. By contrast, in the case at bar, as Pilot made clear in its letter of termination, it was acting according to its inherent and reserved contractual authority to terminate the agreement for "a material violation" of the agreement by LJL which went "to the very essence of the Agreement."  Letter of Termination, 1/14/01 (R.R. at 69a–70a).

a contractual relationship under such circumstances. Accordingly, the order of the Superior Court is hereby affirmed.

Chief Justice CASTILLE and Justice SAYLOR, EAKIN, BAER and McCAFFERY join the opinion.