IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Warwick Township Water and     :
Sewer Authority     :
    :
       v.     :    No. 1831 C.D. 2016
    :    Argued: October 19, 2017
Warwick Realty Co., L.P.,     :
          Appellant     :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
             HONORABLE ROBERT SIMPSON, Judge
             HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY PRESIDENT JUDGE LEAVITT             FILED: December 7, 2017

Warwick Realty Co., L.P. (Realty) appeals an order of the Court of Common Pleas of Bucks County (trial court) entering judgment in favor of the Warwick Township Water and Sewer Authority (Authority) for two municipal claims together with interest and attorney fees. Realty asserts that the record does not support the trial court's conclusion that the Authority properly assessed Realty for its water and sewer use and, further, there was no basis for an award of attorney fees. For the following reasons, we affirm.

**Background**

The facts are undisputed. Realty owns property at 1621 Mearns Road, Warwick Township, Bucks County, Pennsylvania, which was created out of a tract of land known as the Mearns Road Business Campus (Business Campus). Prior to 2003, the Business Campus had a tax parcel identification of No. 51-13-62. In 2003, Mearns Road Business Campus, L.P. subdivided the Business Campus into five lots. "Lot 1," later conveyed to Realty, retained Business Campus' tax identification

number, and the other four new lots received new tax designations. Two industrial condominiums were later developed on Lot 2; Lots 3, 4 and 5 remain undeveloped.

Beginning in the 1990s, Mearns Road Business Campus, L.P. operated an ice skating rink on Lot 1, using a private water well and a septic system. In July 2006, the rink was connected to the Authority's water and sewer system. To determine a customer's tapping fee, the Authority uses Equivalent Dwelling Units (EDU) to measure water use. The tapping fee is $4,500 per EDU for water usage and $6,300 per EDU for sewer usage. The Authority assesses one EDU for 270 gallons of daily usage.[1]

On August 31, 2006, Realty purchased Lot 1 and continued to operate the skating rink. During the last quarter of 2006, Realty used 96,000 gallons of water, which equates to 3.95 EDUs. Thereafter, Realty's water usage increased to 9.67 EDUs. By the end of the first quarter of 2009, its water usage reached 11.15 EDUs.

On April 22, 2009, the Authority informed Realty by letter that the water and sewer usage on Lot 1 exceeded its initial assessment of 3.06 EDUs. The letter stated as follows:

> This letter is to serve notice that the Warwick Ice Rink located at the Mearns Road Business Campus is exceeding the water and sewer usage as allocated in the original PA DEP [Department of Environmental Protection] planning module submission dated October 29, 1998 and approved by the Authority.

---

[1] To calculate tapping fees, the Authority first divides a customer's quarterly water usage by 90 days to determine the per day gallon usage. The Authority then divides that figure by 270 gallons per day to determine the total number of EDUs to be allocated. Finally, the Authority multiplies the total number of EDUs by the cost per EDU to determine the total amount of tapping fees owed. Realty Brief at 10.

*The skating rink (Lot #1) was appropriated 825 gallons per day (GPD) or 3.06 EDU's during the planning and land development process.* The average daily usage over the last three quarters is 1861 GPD (6.89 EDU's). The first quarter usage for 2009 has exceeded 11.15 EDU's or 3011 GPD.

Reproduced Record at 256a (R.R. __) (emphasis added).

On April 28, 2014, the Authority sent Realty another letter stating that, following an audit of Realty's water and sewer history, the Authority determined as follows:

[A]n additional eight (8) E[DU]'s are needed for [Lot 1] … based on an average usage for the past two (2) years….[2] This would bring [Realty's] total allocation to eleven (11) EDU's. The Authority has the right to assess the EDU allocation based on the highest quarterly average which is currently fifteen (15) EDU's. We have taken a conservative approach in our analysis and assignment of [Realty's] previous metered usage (copy attached) and EDU allocation and therefore the invoice dated April 7, 2014 remains outstanding for this property.

R.R. 197a.

Realty responded that the Authority had assigned 11 EDUs to Lot 1 and, therefore, it could not owe the additional eight EDUs. In support, Realty noted that on October 29, 2002, Mearns Road Business Campus, L.P., entered into an agreement with the Authority for the acquisition of 11 EDUs from the Authority. Realty further explained:

This was confirmed with the developer, Ed Dudlik of the Mearns Road Business Campus L.P. at the time in which we had acquired the property in 2006. In the Agreement of Sale, all rights, titles,

---

[2] Pursuant to the Municipality Authorities Act, 53 Pa. C.S. §§5601-5623, a municipal authority has the right to assess additional EDUs as water and sewer usage increases. *See* 53 Pa. C.S. §5607(d)(24)(i)(C)(I) ("An authority may … impose additional capacity-related tapping fees on specific groups of existing customers such as commercial and industrial customers in conjunction with additional capacity requirements of those customers.").

3

and interests to all EDUs and tap fees were transferred at the time of our acquisition of the property.

R.R. 200a. The Authority replied that its 2002 agreement with Mearns Road Business Campus, L.P., did not have "any bearing upon the skating rink." R.R. 202a. The Authority further advised, "[f]ailure to comply with the appropriate payment will cause the filing of a municipal lien and consideration of a subsequent termination of Authority services to the skating rink." *Id.*

On October 24, 2014, the Authority informed Realty that it was increasing the EDU assessment of Lot 1 from 11 EDUs to 15 EDUs:

> Additionally, based upon further review of the Warwick Ice Rink records, the applicable EDUs for the facility should be set at 15 rather than the previous indication of 11. Based upon this revision of EDU charges, a statement from the Authority will be forthcoming regarding additional fees (water and sewer) at Four Thousand Five Hundred ($4,500.00) Dollars and Six Thousand Three Hundred ($6,300.00) Dollars per EDU respectively. *Such additional tapping fees are required to be paid within sixty (60) days of the subject statement.*
>
> The originally charged payment of Eighty-six Thousand Four Hundred ($86,400.00) Dollars (for the original additional eight (8) EDUs) remains unpaid and is in the process of appropriate action.

R.R. 220a-221a (emphasis added).

Realty did not pay the additional tapping fees. On October 27, 2014, the Authority filed a municipal claim pursuant to what is commonly referred to as the Municipal Claims and Tax Liens Act (Municipal Claims Act)[3] against Lot 1 for

---

[3] Act of May 16, 1923, P.L. 207, *as amended*, 53 P.S. §§7101-7505. In Pennsylvania, municipal claim procedure is purely statutory. Once the municipality files a claim for services, the claim becomes a lien on the property. Section 3(a)(1) of the Municipal Claims Act, 53 P.S. §7106(a)(1) ("All municipal claims … shall be and they are hereby declared to be a lien on said property[.]");

water and sewer tapping fees for eight additional EDUs in the amount of $86,430.25, along with associated fees and costs. On February 6, 2015, the Authority filed a second municipal claim against Lot 1 for tapping fees for four additional EDUs in the amount of $43,200, along with fees and costs. Realty requested the Authority to file a writ of *scire facias* on each claim, which the Authority did.[4] Realty then filed an affidavit of defense. The trial court consolidated the writs and conducted hearings thereon on December 15, 2015, and January 20, 2016.

In support of its claim that Lot 1 was entitled to three EDUs, the Authority offered a letter dated May 1, 2000, from Thomas Courduff, the former Executive Director of the Authority, to Edward Dudlik, owner of Mearns Road Business Campus, L.P. The letter stated:

> As a follow-up to our recent telephone conversation, I am confirming the following to you, that, *based upon a daily water use of 825 gallons per day, the existing skating rink has been assigned 3.03 EDU's*.
>
> …
>
> Please recall that a total of 11 EDUs has been assigned to the entire project.

---

*GSP Management Co. v. Duncansville Municipal Authority*, 126 A.3d 369, 373 n.1 (Pa. Cmwlth. 2015).

[4] A writ of *scire facias* sur municipal claim is "a writ used to enforce payment of a municipal claim out of the real estate upon which such claim is a lien." *Valley Forge Sewer Authority v. Hipwell*, 121 A.3d 1164, 1165 n.1 (Pa. Cmwlth. 2015) (quoting *Fox Chapel Sanitary Authority v. Abbott*, 384 A.2d 1012, 1013 n.1 (Pa. Cmwlth. 1978)). A property owner that is aggrieved by a municipal lien that is not defective on its face may obtain an adjudication as to the validity of the lien by serving notice upon the municipality to issue a writ of *scire facias* on the claim. *Id.* at 1166 n.3. "A writ of *scire facias* to ascertain the amount due on a lien is ordinarily requested by a property owner to give him the opportunity to show why the lienholder should not be allowed to execute on his property." *Id.* After the lienholder issues the writ, the owner may file an affidavit raising his defense to the lien. *Id*.

5

R.R. 252a (emphasis added). Michael Sullivan, the current Executive Director of the Authority, explained the significance of Courduff's letter. Originally, the entire Business Campus parcel was assigned 11 EDUs. Thereafter, in the course of the subdivision and planning process, the newly subdivided lots received a new allocation of EDUs. Courduff's letter notified Dudlik that 3.03 EDUs, of the original 11 EDUs, were being assigned to Lot 1. Notes of Testimony (N.T.), 12/15/2015, at 19-20; R.R. 473a-474a. Sullivan also testified that eight EDUs were assigned to Lot 2, for the proposed development of the industrial condominiums.

In further support of this allocation of the EDUs, Sullivan testified about an October 29, 1998, letter from Carroll Engineering Corporation (Carroll), Dudlik's consultant on the development, to Courduff. The letter was offered into evidence.[5] The letter projected sewage flow of 608 gallons per day for Lot 1, and 2,100 gallons per day for Lot 2. In 1999, Boucher & James, Inc., the engineering firm for the Authority, recommended that the sewage flow projection for Lot 1 be increased to 825 gallons per day, for a total projected use for both Lots 1 and 2 of 2,925 gallons per day. A handwritten note on the Carroll letter stated that 3.06 EDUs would be assigned to Lot 1, and 7.78 EDUs would be assigned to Lot 2, which rounds up to 8 EDUs. Boucher & James's recommendation was also admitted into evidence.

Sullivan explained that every development requires the submission of a sewer planning module to the Pennsylvania Department of Environmental Protection (DEP) for its review. He explained that DEP's approval of the planning module "gives the developer the ability to buy those EDUs based on the approved flow." N.T., 1/20/2016, at 18-19; R.R. 620a-621a. In the instant case, the planning

---

[5] The letter was sent from the engineering firm and signed by an initial, "J."

6

module submitted to DEP on January 7, 2000, showed a projected total flow of 2,925 gallons per day, or 10.83 EDUs, for "Mearns Road Business Campus Lot Nos. 1 &2." R.R. 302a.

The Authority also presented its billing department records showing that Realty used 271,000 gallons of water, or 11 EDUs, over the first quarter of 2009; and 366,000 gallons of water, or 15 EDUs, over the first quarter of 2014. That usage, Sullivan testified, provided the basis of the Authority's assessment of 12 additional EDUs against Lot 1.

Realty responded with evidence to support its position that Lot 1 was entitled to 11 EDUs. Realty offered a copy of an October 29, 2002, agreement (Agreement) between the Authority and Mearns Road Business Campus, L.P. Section 17 states as follows:

> DEVELOPER, within seven (7) days after the execution hereof, shall provide to AUTHORITY a two (2) year letter of credit … acceptable by the AUTHORITY as security of payment for *eleven (11) water tapping fees* of Four Thousand Five Hundred ($4,500.00) Dollars each for the PROJECT, which totals Forty Nine Thousand Five Hundred ($49,500) Dollars, and, *eleven (11) sewer tapping fees* of Six Thousand Three Hundred ($6,300.00) Dollars each for the PROJECT, which totals Sixty Nine Thousand Three Hundred ($69,300.00) Dollars, for total tapping fees of One Hundred Eighteen Thousand Eight Hundred ($118,800.00) Dollars….

R.R. 181a (emphasis added). The Agreement defines "PROJECT" as "two (2) condominium buildings, each containing fourteen (14) units, to connect to the public water distribution and sanitary sewer system of the AUTHORITY …[.]" R.R. 165a. The Agreement further identifies "DEVELOPER" as "the legal or equitable owner of certain real estate located in Warwick Township, Bucks County, Pennsylvania, known as Bucks County Tax Map Parcel No. 51-13-62, commonly referred to as

7

Mearns Road Business Campus ("PREMISES")[.]" R.R. 164a. The tax parcel identified as No. 51-13-62 is the tax number of Lot 1, which Realty now owns. Nowhere does the Agreement refer to an allocation of EDUs between Lots 1 and 2.

Philip Pulley, a general partner of Realty, next testified. He explained that he "met with the Water and Sewer Department to go through their files[,]" and he obtained a copy of the Agreement from the title company. N.T., 12/15/2015, at 76; R.R. 530a. He believed that at the time of Realty's purchase, Lot 1 was allocated 11 EDUs because the tax parcel number referenced in the Agreement is Lot 1's tax number. He noticed, however, that the Agreement identified "project" as "two condominium buildings," which he found "very confusing":

> [T]his all became very confusing because it's our lot number. And so because this property has a lot of excess ground, there was some question about whether that applied to Dudlik building additional stuff on this tax parcel number.

*Id.* at 82; R.R. 536a.

Realty submitted its sales agreement with Mearns Road Business Campus, L.P. dated June 14, 2006, along with a deed executed on August 31, 2006, showing Realty's purchase of Lot 1. Section 10(j) of the sales agreement assured Realty that tapping fees had been paid in full:

> *The Seller represents and warrants that* the property is connected to public sewer and Exelon Energy for Gas and Electric. The property is not currently connected to public water. The Seller represents and warrants that all work and costs related to the water connection will be completed and paid prior to Closing. *There are no connection, Tap or E[DU] fees due and payable and all connection fees have been paid in full*.

R.R. 152a (emphasis added). Realty also submitted a letter of credit dated July 29, 2003, and the Authority's ledger of October 28, 2004, which showed that Mearns

8

Road Business Campus, L.P. paid tapping fees for 11 EDUs in a total amount of $118,800.

The trial court entered judgment in favor of the Authority for a total amount of $170,036.53. It found, as fact, that when Business Campus was subdivided, Lot 1 was assigned 3.06 EDUs, and Lot 2 was assigned 7.78 EDUs. Because the tapping fees for the 3.06 EDUs had been paid, Realty was entitled to credit for 3.06 EDUs. Noting that the Municipality Authorities Act authorizes the Authority to assess additional EDUs based on usage, the trial court found the Authority's assessment of an additional 12 EDUs upon Realty was warranted. Finally, the trial court granted the Authority's request for reasonable attorney fees in the amount of $30,000.

Realty filed a motion for post-trial relief. It contended that the Agreement allocated all 11 EDUs to Lot 1. This was contradicted by the Carroll letter of 1998 and the Authority letter of 2000, but those letters did not constitute an enforceable agreement. Realty further argued that the Authority's failure to modify the Agreement to allocate 3.06 EDUs to Lot 1 after the subdivision occurred in 2003 was "an oversight for which [Realty] should not be held responsible." Post-Trial Motion at 5, ¶13; R.R. 768a.

On June 30, 2016, the trial court entered an order striking its June 8, 2016, judgment, and directing the parties to submit briefs with proposed findings of fact and conclusions of law. After review, the trial court denied Realty's post-trial motion. On October 14, 2016, judgment was entered in favor of the Authority "for the sum of $170,036.53 on the Order dated: 06/08/2016." Order, 10/14/2016; R.R. 11a.

9

After Realty appealed to this Court, the trial court ordered Realty to file a Pennsylvania Rule of Appellate Procedure 1925(b) statement.[6] It did so, which prompted the trial court to issue a Rule 1925(a) opinion.[7]

In its Rule 1925(a) opinion, the trial court explained that the dispute concerned the assessment of tapping fees on Lot 1. Neither party produced evidence "to establish the amount paid by the former owner for the tapping fees relating to [Lot 1] …." Trial Court 1925(a) op. at 3; R.R. 857a. However, the Authority's evidence established that Lot 1 was allocated 3.06 EDUs and that Realty's actual water usage during the last quarter of 2006 was 3.95 EDUs. This was close to the original assessment of 3.06 EDUs. The trial court found Realty's reliance on the Agreement between the Authority and Mearns Road Business Campus, L.P. was misplaced. The Agreement addressed the development of the entire tract, not just Lot 1. Accordingly, the 11 EDUs had to be allocated between Lot 1 and Lot 2.

**Appeal**

---

[6] Rule 1925(b) provides, in pertinent part:

> If the judge entering the order giving rise to the notice of appeal ("judge") desires clarification of the errors complained of on appeal, the judge may enter an order directing the appellant to file of record in the trial court and serve on the judge a concise statement of the errors complained of on appeal ("Statement").

PA. R.A.P.1925(b).

[7] Rule 1925(a)(1) states, in relevant part, as follows:

> [U]pon receipt of the notice of appeal, the judge who entered the order giving rise to the notice of appeal, if the reasons for the order do not already appear of record, shall forthwith file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, or shall specify in writing the place in the record where such reasons may be found.

PA. R.A.P.1925(a)(1).

On appeal,[8] Realty raises two issues. First, it argues that the trial court erred in finding that it was entitled to 3.06, rather than 11 EDU credits. Second, it argues that the trial court erred in awarding the Authority attorney fees.

As it contended before the trial court, Realty argues that the October 29, 2002, Agreement, which is binding on the Authority, allocated 11 EDUs to "Bucks County Tax Map Parcel No. 51-13-62," which is the tax number assigned to Lot 1. R.R. 164a. It was the Authority's "unilateral mistake," Realty argues, "[to leave] in place an allocation of 11 EDUs for a tax parcel number which originally applied to the entire [Business] Campus prior to subdivision and, post subdivision, applied only to Lot 1". Realty Brief at 31. Realty reasonably relied upon the Agreement to conclude that Lot 1 had been assigned 11 EDUs.

Realty further argues that the Carroll letter of 1998, the recommendation from Boucher & James, and the Authority letter of 2000, "are not competent evidence of a contractual agreement between the Authority and [Mearns Road Business Campus, L.P., the former owner.]" Realty Brief at 29. Those documents contain only "projections" of water and sewer usage, and were done long before Lot 1 was connected to the Authority's water and sewer systems. Realty Brief at 39-40. In any event, Realty was not aware of the allocations of EDUs between Lots 1 and 2 at the time of purchase because it did not have access to any of those documents.

The Municipal Claims Act authorizes the filing of a claim "arising out of, or resulting from … service supplied, work done, or improvement authorized and

---

[8] "This Court's scope of review of a trial court's order disposing of a petition to strike a municipal claim is limited to a determination of whether the court abused its discretion or committed an error of law or whether constitutional rights were violated." *Valley Forge Sewer Authority*, 121 A.3d at 1167 n.4 (quoting *Penn Township v. Hanover Foods Corporation*, 847 A.2d 219, 222 n.10 (Pa. Cmwlth. 2004)).

11

undertaken, by a municipality," which "shall include all penalties, interest, costs, fines, charges, expenses and fees, including reasonable attorney fees, as allowed by this act and all other applicable laws." Section 1 of the Municipal Claims Act, 53 P.S. §7101. Municipal claims constitute *prima facie* evidence of the facts averred within the claim. Section 20 of the Municipal Claims Act, 53 P.S. §7187. Further, the municipal claims constitute conclusive evidence except where they have been specifically denied by an owner's affidavit of defense. *Id*. The owner, as the defendant in a *scire facias* proceeding, bears the burden of overcoming the municipality's *prima facie* case by presenting sufficient evidence that the claims are erroneous. *General Municipal Authority of the Borough of Harvey's Lake v. Yuhas*, 572 A.2d 1291, 1294 (Pa. Super. 1990); *see also Abbottstown Paradise Joint Sewer Authority v. Carter*, (Pa. Cmwlth., No. 983 C.D. 2007, filed January 24, 2008), slip op. at 4.[9] The trial court, as factfinder, may believe all, part, or none of the evidence presented. The appellate court is "not permitted to reexamine the weight and credibility determinations or substitute our judgment for that of the factfinder." *Abbottsown Paradise Joint Sewer Authority*, slip op. at 4-5 (quoting *Turney v. Media Fuel, Inc. v. Toll Brothers, Inc.*, 725 A.2d 836, 841 (Pa. Super. 1999)).

The Authority claimed that Lot 1 was allocated three EDUs at the time of Realty's purchase; Lot 1's usage exceeded that allocation; and Realty refused to pay tapping fees for the additional 12 EDUs assessed by the Authority. The Authority provided evidence to support each of those claims and established a *prima facie* case. In opposition, Realty asserted that in 2002, Authority assigned 11 EDUs

---

[9] Pursuant to Commonwealth Court Internal Operating Procedure §414(a), 210 Pa. Code §69.414(a), an unreported opinion of this Court may be cited for its persuasive value and not as binding precedent.

12

to Lot 1 by the Agreement. The trial court found, however, that the Agreement applied to the entire parcel before it was subdivided. We agree.

> Section 17 of the Agreement states in relevant part, as follows:

> DEVELOPER, within seven (7) days after the execution hereof, shall provide to AUTHORITY a two (2) year letter of credit … acceptable by the AUTHORITY as security of payment for *eleven (11) water tapping fees* of Four Thousand Five Hundred ($4,500.00) Dollars each for the PROJECT, which totals Forty Nine Thousand Five Hundred ($49,500) Dollars, and, *eleven (11) sewer tapping fees* of Six Thousand Three Hundred ($6,300.00) Dollars each for the PROJECT, which totals Sixty Nine Thousand Three Hundred ($69,300.00) Dollars, for total tapping fees of One Hundred Eighteen Thousand Eight Hundred ($118,800.00) Dollars….

R.R. 181a (emphasis added). The Agreement identifies "DEVELOPER" as "the legal or equitable owner of certain real estate located in Warwick Township, Bucks County, Pennsylvania, known as Bucks County Tax Map Parcel No. 51-13-62, commonly referred to as Mearns Road Business Campus ("PREMISES")[.]" R.R. 164a.

In interpreting the language of a contract, we ascertain the intent of the parties and give it effect. *LJL Transportation, Inc. v. Pilot Air Freight Corporation*, 962 A.2d 639, 647 (Pa. 2009). "When the words of an agreement are clear and unambiguous, the intent of the parties is to be ascertained from the language used in the agreement, … which will be given its commonly accepted and plain meaning[.]" *Id.* (internal quotations omitted). Further, "in determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect." *Id.* Therefore, "we will not interpret one provision of a contract in a manner which results in another portion being annulled." *Id.*

13

We reject Realty's interpretation of the Agreement to mean that it allocated 11 EDUs to its parcel, now designated "Lot 1" with the tax identification number of 51-13-62. The Agreement addresses the development of "Mearns Road Business Campus," which is the tract subdivided in 2003 to form Lot 1 and four additional lots numbered 2 through 5. Further, Section 17 states that the tapping fees of $118,800.00 were paid for the "project," which is identified in the Agreement as "two (2) condominium buildings, each containing fourteen (14) units[.]" R.R. 165a. The "Premises" identified in the Agreement showed the tax parcel number presently assigned to Realty's Lot 1. However, Realty acknowledges that "[the] tax parcel number [was] originally applied to the entire [Business] Campus prior to subdivision and, post subdivision, applied only to Lot 1." Realty Brief at 31. Construing the Agreement as allocating the 11 EDUs to the skating rink would create a conflict between the key terms of the Agreement and be contrary to the ordinary meaning of the written terms.

Realty argues that the Authority should have modified the Agreement to do a new allocation of EDUs between Lots 1 and 2 after the subdivision. The Authority's so-called "unilateral mistake" led Realty to believe that upon its purchase of Lot 1, it would acquire 11 EDUs. Realty's argument is not persuasive. The Agreement states that the tapping fees of $118,800 were paid for the "project," which was identified as two condominium buildings. No condominiums were planned for Lot 1. Accordingly, Realty should have known that the tapping fees were not related to the existing skating rink. Indeed, even Pulley, Realty's general partner, testified that he found the terms of the Agreement "very confusing." N.T., 12/15/2015, at 82; R.R. 536a. By contrast, the Authority's interpretation gives effect to *all* of the terms of the Agreement. *See LJL Transportation, Inc.*, 962 A.2d at 647.

14

It is the property owner, as the defendant in a *scire facias* proceeding, who bears the burden of overcoming the municipality's *prima facie* case by presenting sufficient evidence that the claims are erroneous. *General Municipal Authority of the Borough of Harvey's Lake*, 572 A.2d 1291; *Abbottsown Paradise Joint Sewer Authority*, slip op. at 4. Because the Agreement did not allocate more than three EDUs to the skating rink on Lot 1, we hold that the trial court did not err in its judgment.

Finally, Realty argues that the trial court erred in awarding the Authority attorney fees because it did not consider the Authority's "bad faith at trial for its failure to disclose the amount paid by Dudlik for tapping fees prior to the first day of trial, and its withholding of such information for 17 months, until 5 days before the second day of trial[.]" Realty Brief at 48.

Section 20 of the Municipal Claims Act provides, "[i]f plaintiff recovers a verdict, upon trial, in excess of the amount admitted by the defendant in his affidavit of defense or pleadings, he shall be entitled to reasonable attorney fees for collection in accordance with [S]ection 3 [of the Municipal Claims Act]." 53 P.S. §7187. This Court has further held:

> Reading both [Sections 20 and 3 of the Municipal Claims Act, 53 P.S. §§7187, 7106] in conjunction with one another, as required under the rules, once the trial court rules in favor of the municipality on its municipal lien, the challenge by the property owner is deemed to be meritless, therefore, entitling a municipality to an award of reasonable legal fees.

*Valley Forge Sewer Authority*, 121 A.3d at 1172 (citing *Borough of Walnutport v. Dennis*, 13 A.3d 541, 547 (Pa. Cmwlth. 2010)). The trial court further found the attorney fees reasonable, and Realty did not challenge their amount. Accordingly, the trial court did not err in awarding the Authority attorney fees.

## Conclusion

For the above-stated reasons, we affirm the order of the trial court.

_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Warwick Township Water and :
Sewer Authority :
 :
   v. : No. 1831 C.D. 2016
 :
Warwick Realty Co., L.P., :
     Appellant :

# **O R D E R**

   AND NOW, this 7th day of December, 2017, the order of the Court of Common Pleas of Bucks County, dated October 7, 2016, in the above-captioned matter is hereby AFFIRMED.

             _____
             MARY HANNAH LEAVITT, President Judge