# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Housing and Redevelopment Insurance Exchange | : |
| | : |
| | : |
| v. | : |
| | : |
| County of Lackawanna and Joseph P. Durkin | : |
| | : |
| County of Lackawanna | : |
| | : |
| v. | : |
| | : |
| Dominick Verrastro, Housing and Redevelopment Insurance Exchange and Foxco Insurance Management Services, Inc. and Joseph P. Durkin, Individually and t/d/b/a JD Insurance Consultants | : |
| | : Nos. 867 and 868 C.D. 2015 |
| Appeal of: Lackawanna County | : Argued: March 7, 2016 |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI          FILED: March 31, 2016

Lackawanna County (County) appeals from an order of the Lackawanna County Court of Common Pleas (trial court) entering judgment in favor of the Housing and Redevelopment Insurance Exchange (Insurer) and against the County pursuant to its determination that Insurer did not improperly deny the County's property-damage claim. For the reasons that follow, we affirm the trial court's order.

## I.

### A.

The following facts are not in dispute. Insurer is organized as an insurance indemnification reciprocal insurance exchange in the Commonwealth of Pennsylvania and by definition is an unincorporated group of subscribers, which acts as both insurer and insured. An attorney-in-fact is legally required for operational function and regulatory compliance, and at all times relevant hereto, Foxco Insurance Management Services, Inc. (Foxco) served as Insurer's attorney-in-fact.

In July 2006, while Joseph Durkin (Durkin) was serving as an insurance agent for the County through his company, JD Insurance Consultants, he obtained a commercial property policy from Foxco, acting on Insurer's behalf, which insured the Montage Mountain Ski Area (Ski Area) for a policy period of July 15, 2006 through July 15, 2007. The commercial policy provided blanket insurance coverage to numerous structures on the County's property, including the Toyota Pavilion Amphitheater (Amphitheater). It listed the first named insured as the Lackawanna County Montage Ski Area and its address as Montage Mountain

2

Road, P.O. Box 3539, Scranton, Pennsylvania 18505. At this time, Dominic Verrastro served as the insurance coordinator for the County pursuant to a "Coordinator Agreement for Independent Insurance Coordinator" (Coordinator Agreement).[1]

In November 2006, the County executed a real estate closing through its attorney, James Tressler, Esquire, whereby it sold Montage Mountain to Sno Mountain, LLC but retained the Amphitheater. Durkin then requested cancellation of the policies. Although the commercial policy contained a cancellation provision, it was supplanted by a cancellation endorsement, providing as follows:

**PENNSYLVANIA CHANGES—
CANCELLATION AND NONRENEWAL**

---

[1] The Agreement defines Verrastro's scope of services as follows:

> The Coordinator agrees to be the point of origination of all property and casualty, policies required by the County. The Coordinator agrees to collect and review all property and casualty policies that currently exist where the County is named insured as well as for all subsidiary authorities. The Coordinator further agrees to review with the designated person or agents any matters material to the placement of said policies through the assignment of such policy or the bidding process. The Coordinator also agrees to stay in contact with the designated person or agents to assure compliance with terminations dates on policies and to eliminate any duplication of coverage where applicable. However, nothing herein shall place a duty upon the coordinator to offer any professional advice as to the necessity or appropriateness of coverage, which shall be the sole responsibility of the designated agent for that particular coverage.

(Reproduced Record [R.R.] at 182a.)

This endorsement modifies insurance provided under the following

***

Commercial Property Coverage Part

***

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**CANCELLATION**
  **1.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

***

  **3. Cancellation Of Policies in Effect For 60 Days or More**
  If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons….

***

  **4.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

  **5.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**6.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

**7.** If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

(Reproduced Record [R.R.] at 179a-180a.)

By letter dated January 15, 2007, Insurer forwarded to Durkin at his business address cancellation endorsements for four separate insurance policies covering the Ski Area, including a cancellation endorsement for the commercial policy. Each cancellation endorsement bore an effective date of December 1, 2006. By letter dated March 5, 2007, Insurer forwarded to Durkin's business address additional copies of the cancellation endorsements as well as a check made payable to the County with respect to unearned premium from the commercial policy and an invoice for $7,680.52 to Durkin, requiring him to return the unearned commission with respect to that policy. Upon receipt of the March 2007 letter, Durkin forwarded the notices of cancellation and the check to the County, which endorsed and deposited the check into the County's general fund account on March 22, 2007. Durkin also returned his unearned commission by personal check. Both

5

correspondences were directed exclusively to Durkin at his business address, rather than to the County's address as provided on the declarations page.

On February 14, 2007, the roof to the Amphitheater collapsed due to a severe snowstorm, resulting in $1,630,262.36 damage. The County filed a property-damage claim on January 17, 2008, but Insurer denied the claim by letter dated January 29, 2008, asserting that Durkin cancelled the commercial policy on the County's behalf, effective December 1, 2006.

**B.**

Following the claim denial, Insurer filed an amended action for declaratory judgment against the County, former County Commissioner Robert Cordaro, Durkin, and the then-current County Commissioners, seeking a declaration that because Durkin cancelled the policy on behalf of the County, Insurer was not obligated to provide coverage with respect to the roof collapse. Conversely, the County filed a complaint with the trial court, alleging that Insurer breached the commercial policy and denied the claim in bad faith under 42 Pa. C.S. §8371.[2]

In support of its breach of contract action and in opposition to Insurer's declaratory judgment action, the County alleged that Durkin's

---

[2] Initially, the County filed an eleven-count complaint against the Insurer, Foxco, and Dominic Verrastro, the County's insurance coordinator. However, the trial court dismissed the majority of the counts following the parties' cross-motions for summary judgment.

6

cancellation of the commercial policy was void because he acted without the County's specific authority and because Insurer failed to provide the notice of cancellation required by the Policy. To this end, the County presented the testimony of Attorney Tressler, who stated that although he advised Durkin of the sale, he never discussed insurance policy issues with him and never advised him or Verrastro to cancel the commercial policy.

The County also presented the testimony of Mike Washo, a former County Commissioner who served from May 2005 through the end of 2007. He stated that after the loss, the County hired Richard Jones as Risk Manager[3] to investigate the claim and determine if coverage existed, after which Jones reported that a valid claim existed and submitted the claim to Insurer. He denied that the County intended to cancel the commercial policy in 2006 or 2007, as related to the Amphitheater. He further clarified that during his tenure, the commissioners took no official action at any public meeting to direct cancellation of the commercial policy, to provide Durkin authority to cancel it, or to appoint or designate Durkin the County's broker of record on the commercial policy. Similarly, he did not recall the commissioners approving a broker of record for any County insurance policy, including the general liability policy governing the Ski Area. In December 2007 or January 2008, he recalled that a County meeting took place at which Verrastro advised that he had instructed Insurer to cancel the policy as per the request of Durkin.

---

[3] Washo later stated that Jones's job title was, in fact, fleet manager.

Additionally, the County introduced the testimony of Richard Jones, who stated that he worked as the County's Deputy Director of Insurance and Risk Management since January 2008, in which capacity he handed all insurance matters for the County, including dealing with its designated agents and adjustors. His recalled that his first assignment was to investigate the Amphitheater loss, for which he found "no evidence that the first named insured ever requested cancellation of this policy." (*Id.* at 705a.) He stated that the January 2007 notice of cancellation of the commercial policy was never provided to the County, despite the fact that the declarations page lists the County's name and address as the insured. Further, he found no evidence that a notice was sent via registered or first-class mail.

The County also presented the affidavit of Joanne Dodgson, Insurer's Accounts Receivable Manager, stating that on January 15, 2007, Paul Johnson, Insurer's underwriter, forwarded the cancellation endorsements to her, and upon receipt, she forwarded the same to Durkin at his Clarks Summit business address. She further attested that on March 5, 2007, she forwarded the unearned premium check and additional copies of the cancellation endorsements to Durkin at the same address.

In reviewing Dodgson's affidavit and letter, Jones testified that his investigation revealed no correspondence dated January 15, 2007, and that the March 2007 letter was sent only to Durkin as "agent" for the County despite the fact that he was not listed as the first named insured and his address was not listed as the first named insured's last mailing address on the declarations page. As such,

8

Jones opined that Insurer failed to comply with the cancellation endorsement provisions.

> On or about the week following the sale of real estate at Montage in December 2006, Joe Durkin, the lawfully recognized agent for the insured, Lackawanna County, called our offices. He informed Mr. Verrastro, the County's insurance coordinator, as well as an agent for [Insurer], that the County had sold the mountain property covered by the [commercial policy] that was referenced above. He asked Mr. Verrastro to cancel the aforesaid property policy, effective the date of the sale, December 1, 2006.
>
> ***
>
> …On January 15, 2007, the cancellation endorsements memorializing the actual effective date of December 1, 2006 were filed. Mr. Verrastro received the said endorsements on behalf of the County at that time.

(Certified Record, County's Trial Ex. M-134–135.)

With respect to this correspondence, Jones advised that his investigation did not reveal "anything that referred to Joe Durkin as having any standing with the property policy in question." (R.R. at 199a-200a.) He also explained that to the extent Insurer sent the endorsements to Durkin, it did not

9

comply with the cancellation endorsement's notice provisions since he is not the first named insured.

In a letter dated February 4, 2008, Attorney Volpe advised the then-current County Commissioners:

> Conversely, when it is the insured, acting through its agents, who is the moving party in ordering the cancellation, the carrier need only agree to the effective date, issue the cancellation endorsement, which is in writing, memorializing the agreed to effective date, give the agent a copy of the endorsement and return any unearned premium.

(Certified Record, County's Trial Ex. M-136.) Jones disagreed, explaining that as per Section A(4) of the cancellation provision, Insurer is required to mail or deliver notice of cancellation to the first named insured at its last known mailing address. In construing Verrastro's insurance coordinator agreement, Jones testified that no provision authorized him to cancel policies on behalf of the County.

On cross-examination, Jones admitted that during his investigation, he did not speak to Durkin, Verrastro, or Joseph McCawley, who was at times referred to as a prior risk manager. Although he acknowledged that a Coordinator Agreement existed, he highlighted that it was "not on any [C]ounty stationary, there's no resolution approved, there's no signatures by the three commissioners, no signature by the solicitor, no signature by the chief of staff which would make it a [C]ounty body of government official document," and therefore reasoned that it

was not an official County document but bound only those who executed it, Verrastro and Commissioner Cordaro. (R.R. at 739a.) Regarding how notice of cancellation could be provided to the County an address which was sold, Jones explained, "The [C]ounty would have still been receiving mail at the PO Box at Stafford Avenue in Scranton. The [C]ounty would still be getting mail, utility bills to pay, et cetera, et cetera, from the time the mountain was still theirs [sic]." (*Id.* at 775a.)

Jones admitted that Verrastro testified during his deposition that he instructed Insurer to cancel the commercial policy at the direction of Durkin and admitted that at the time of the cancellation, Verrastro's Agreement was in effect. When confronted with a July 26, 2006 letter to Durkin at his business address from Foxco which provided copies of the commercial policy Durkin renewed on the County's behalf, directing him to deliver the copies to the County, Jones could not explain why Foxco provided the copies to Durkin, emphasizing that Durkin had not been appointed broker of record with respect to the commercial policy since no broker of record letter existed. He was uncertain whether broker of record letters were statutorily required but pointed out that a broker of letter record was on file for Durkin with respect to other insurance policies the County maintained, such as the Ski Area's general liability policy through Nautilis.[4] Further, Jones admitted that after the sale, Verrastro requested that Nautilis cancel the general liability policy on December 1, 2006, despite the fact it also covered the Amphitheater.

---

[4] That document lists Durkin as the "[a]gent or [b]roker" and the County as the insured. (Certified Record, County's Trial Ex. W-1.)

11

Regarding Verrastro's relationship with the County, Jones stated, "In the strict definition of what an agent is, he was an agent for the county in the sense that he was the county—according to the contract he had with Mr. Cordaro he had an independent insurance coordinator agreement." (R.R. at 851a.) In other words, Verrastro "had an independent insurance coordinator agreement with the [C]ounty through Mr. Cordaro and that he was also a representative of Foxco." (*Id*. at 852a.) With respect to a premium finance agreement between the County and Northeast Premium Finance Company for the Ski Area's general liability policy for the period of July 15, 2006 to July 15, 2007, he admitted that Durkin had the ability to bind the County. However, Jones clarified that at the time the finance agreement was executed, Durkin had a broker of record letter authorizing him to perform all of the County's requests for insurance with regard to this particular general liability policy.

On redirect, Jones reviewed Verrastro's deposition testimony, in which he testified that the Agreement did not authorize him to cancel policies on behalf of the County, clarifying that only the County, itself, or its risk manager, commissioners, or chief of staff had such authority. Yet, on re-cross examination, Jones admitted that Verrastro submitted a July 15, 2005 request for cancellation of a different policy, even though his Agreement was in effect at that time.

Additionally, the County presented the testimony of Charles B. Henderson, an expert in the insurance industry and in claims adjustment, who was retained by the County to analyze the instant litigation from an insurance-handling perspective. He opined that based on his expertise and review of the file, Insurer

12

did not follow the law in cancelling the commercial policy because it "never gave written notice to the first named insured at the last known address stating [it was] cancelling the policy." (*Id.* at 904a.) Initially, he agreed that if an insured authorized its broker to procure policies, select carriers, or cancel policies the broker could do so. However, after admitting that he did not know what a broker's typical duties are, he later stated, "I don't believe a broker can cancel a policy…I've never seen a broker in my 40 years of experience cancel a policy on behalf of insureds." (*Id.* at 938a-939a.) He denied that there exists a statute or insurance regulation requiring a written memorialization of a first insured's appointment of an individual as a broker of record but explained that broker of record letters are designed to advise the insurer who is authorized to act on behalf of the insured and to:

> keep 50 agents from running to some insurance company saying I represent the county, here's my bid for this property, here's my bid for that one. So these insurers like county municipalities, they'll say okay, I want you to go out and procure my general liability policy and here's my broker of record letter from my general liability policy. You can go tell all these general liability carriers I'm authorized to solicit business for the county on their [sic] behalf for a general liability policy, which is evident in this case.

(*Id.* at 923a.) Further, as a courtesy, it advises the insurer specifically and exclusively with whom to deal relative to a certain policy.

He further explained the fact that a broker of record letter exists for the general liability policy but not for the commercial policy evidences that the County did not authorize anyone to act on its behalf with respect to the Ski Area's commercial policy. As such, he posited that Durkin was not the broker of record. However, he conceded that he did not know what express, implied, or apparent authority was or how those relationships could be established in the insured/broker context.

Regarding the Insurer's compliance with the cancellation endorsement's procedural requirements, Henderson reiterated that the cancellation notice had to be sent to the first named insured, regardless of prior practice, and that prior practice had no bearing because the provision at issue was not ambiguous. He acknowledged that the notice of cancellation for the commercial policy was sent to Durkin, but stated that even the notice listed the insured's address as a P.O. Box in Scranton. He explained that as per Verrastro's deposition testimony, Verrastro had no authority to cancel policies or bind coverage on behalf of the County and that if Verrastro was instructed to do so by Durkin, Verrastro's reliance upon the instruction was unreasonable because no broker of record letter existed for the policy, which was a fact known by the Insurer.

In support of its action for declaratory judgment and in opposition to the County's action, the Insurer presented the testimony of Durkin, who stated that typically, a broker of record letter advises a carrier as to with whom it may deal exclusively.

He stated that he handled the County's general liability policy with respect to the Ski Area in 2005 and also procured the commercial policy for the property the following year. While he secured a commercial policy quote and presented it to Verrastro, he denied deciding which quote to accept and stated that he required authorization from Verrastro, the "go to guy," to move forward by binding coverage. (*Id.* at 1117a.) After obtaining approval, he advised the Insurer and obtained a certificate of insurance and policies. However, Durkin admitted that during his deposition, he testified that after receiving quotes, he did not require authority from anyone at the County to select a carrier, accept a particular quote, or procure a policy.

With respect to the 2006 general liability policy, Durkin stated that his business, JD Associates, procured a broker of record letter signed by County Commissioner Bobby Cordaro pursuant to which he filled out an application for insurance, submitted it, and secured and presented the policy quote to Verrastro. Subsequently, he procured the policies, paid the premium, and handled matters concerning the policy. He clarified that broker of record letters are not required and that in instances, he has procured insurance without one. He also executed a premium finance agreement on behalf of the County with Northeast Premium Finance, whereby it agreed to pay the general liability premium for the Nautilus policy on behalf of the County, in exchange for the County's agreement to repay.

With respect to the 2006-2007 commercial policy, Durkin stated that he was the agent who procured the policy. When confronted with his prior deposition testimony in which he stated he was the broker, Durkin explained that

his prior testimony was inaccurate because he had not distinguished between the terms "broker" and "agent." He stated that he was the agent for the County on the commercial policy and therefore received commission regarding it only in terms of procuring it. He continued, "I had no authority." (*Id.* at 1131a.) Verrastro did not receive commission on the commercial policy but nonetheless acted as the "gatekeeper," according to Durkin, by handling the "material day-in day-out business" on the commercial policy. (*Id.* at 1130a, 1153a.) He denied binding coverage on the policy but could not remember if copies of it were directed to him. He stated that it would not be unusual for him to receive them and upon receipt, he would provide to Verrastro for response regarding the requested statement of values. He did admit to receiving at least some correspondence including invoices from the Insurer on the policy but could not recall whether he conversed with any agent of Foxco regarding the policy. He ceased providing services to the County when he returned his unearned commission with respect to the commercial policy in March 2007.

He admitted that he did not know, as of the November 2006 sale, specifically which County assets were transferred. After the sale, Durkin testified that he communicated with Verrastro regarding the property's general liability policy, which the County consciously allowed to default via non-payment of premium after the County unsuccessfully attempted to cancel it on December 1, 2006, and then again on January 5, 2007, because Commissioner Cordaro refused to pay the full premium. He stated that allowing the policy to lapse, which provided coverage to both the Ski Area and the Amphitheater, was a mistake.

16

He also admitted that after the sale, he discussed the commercial policy with Verrastro but could not recall any of the specifics. He denied learning that Verrastro intended to cancel the commercial policy but admitted receiving Dodgson's letter dated March 5, 2007 pursuant to which he returned the unearned portion of his commission without dispute but stated that he was furious for not being notified the commercial policy was cancelled. He could not recall if he raised these objections with the County. He returned copies of the policies he held to Insurer but was uncertain which documents the boxes contained. He denied knowing that the commercial policy covered both the Ski Area and the Amphitheater.

He also testified on cross-examination, as per his deposition testimony, that he generally did not discuss the commercial policy with Verrastro and continued that he had nothing to do with the policy, did not direct Verrastro to cancel it, and did not communicate to Verrastro that Attorney Tressler instructed cancellation of the policy.

Additionally, Insurer presented the testimony of Rich McMonigle, Esquire, its expert in the area of insurance and bad-faith law, who opined regarding the role Durkin played in relation to the County's commercial policy. Specifically, he described Durkin as the broker of record for the County and his responsibilities as those of a typical insurance broker, including searching for and securing coverage on behalf of the County. He stated that legally, a broker is not required to obtain a broker of record letter, although some insurance companies may require one.

17

To the extent Verrastro instructed the Insurer to cancel the commercial policy, Attorney McMonigle stated it would be within his province as the go-to person or the gatekeeper for the County to request an insurer to cancel a County policy. When questioned whether Insurer's failure to send notice of cancellation to the County's last known address negated the cancellation, Attorney McMonigle responded:

> In my opinion, Joseph Durkin as the broker of record, one of the things that he's empowered to do is to communicate on behalf of the insured to get and receive notices from the insured. Typically when the company issues the policy the company will give the policy to the broker of record and the broker takes it to the insured or mails it to the insured.
>
> A couple reasons that's typical is the—there's a client. You know, the insured is the client of the broker, so it allows a little client relation. Also, insurance can be complicated, and if the client, the insured, has any questions, you know, what better person to ask than the broker of record, who is the insured's representative. So it's—you know, it's very common to communicate through the broker, and that's the equivalent of the first name insured in this particular case.

(*Id.* at 1301a-1302a.)

He opined that delivery of the notice of cancellation to Durkin, as the County's representative, complies with the notice provisions of the cancellation endorsement because they are one in the same as per industry standards, as evidenced by the fact that the initial policy was also sent to Durkin.

18

> So, then the insurance company issues the policy, the policy is for the named insured, but you give the policy to the broker of record under the presumption that the broker of record as a representative, that's the delivery. But the broker of record is going to go to his or her client and say hey here's the policy.
>
> Well, similarly the broker of record is the representative of the insured. That would be my view, telling Mr. Durkin or sending these notices to Mr. Durkin did the same as giving it to the first named insured.

(*Id.* at 1307a.) He clarified that Durkin was a broker of record, even without a broker of record letter, because he acted as one.

He testified that although no broker of record letter existed for Durkin with respect to the commercial policy, the parties' course of conduct controlled, pursuant to which Durkin nonetheless acted as broker of record and Insurer treated him as such. He explained that Insurer acted reasonably in forwarding the notices of cancellation to Durkin since it forwarded the original Policy to him the prior July without objection or correction, as it subsequently did with the return of premium check.

On cross-examination, he admitted that nothing under Pennsylvania law provides an insurance coordinator specific authority to cancel a policy on behalf of his insured, but rather, his authority is determined by the applicable agency contract. With respect to Verrastro's Agreement, he noted that it did not specifically authorize him to cancel coverage. He also agreed that there existed no

19

legal provision providing a broker of record specific authority to cancel a policy on behalf of an insured. He further opined that Attorney Tressler could have cancelled the policy on behalf of the County, depending on whether that was within the scope of his representation.

Attorney McMonigle relied upon an affidavit executed by Cordaro, which stated that Durkin, in his capacity as broker of record and/or agent for the County, was authorized to select, bind, and cancel the insurance policies for which he served as agent of record. He also referenced an interrogatory response in which Durkin characterized his relationship with the County as insurance broker/insured.

Next, Insurer presented the testimony of Dodgson, who stated that she was employed with Foxco until 2013, during which period she input policies into the accounting system. She stated that in the event a policy was cancelled, she received notice from the Underwriting Department, sent the notice of cancellation to the agent, and where a credit was due, generated a dummy check she sent to Accounts Payable to trigger its generation of the real check. With regard to the commercial Policy at issue, she testified consistent with her affidavit that on January 15, 2007, she forwarded the notices of cancellation to Durkin as broker of record for the County at his business address. She stated that she sent another letter to him dated March 5, 2007, enclosing the return check and advising of his need to return his unearned commission. She stated that Insurer assigned Durkin an agent number in its database.

Insurer next offered the testimony of Caryn Czarkowski Emiliani, a former Foxco employee who assisted Verrastro administratively. She stated that between December 1, 2006 and January 2007, Durkin appeared at Foxco's offices a number of times. According to her, Durkin dictated a letter to her in Verrastro's presence, which she typed, cancelling the general liability policy, but the commercial policy was not discussed. She also observed Durkin return various policies issued by Insurer to Verrastro on the same day by handing him policy folders but did not look inside the folders to determine which policies were contained. She stated that because the letter she drafted was on incorrect letterhead, Verrastro asked her to reprint it on County letterhead on January 5th. On cross-examination, she acknowledged that she was never asked to type a cancellation letter with respect to the commercial policy.

Moreover, Insurer presented the testimony of Gerard Wallick, the Vice President of underwriting for Excalibur, Foxco's successor. He stated that when dealing with municipalities, Foxco dealt exclusively with insureds' agents. He stated that Verrastro, as an independent agent, placed business through both Insurer and Foxco, as well as other companies. He described Durkin as the agent for the commercial policy.

He stated that because he was involved in underwriting the commercial policy, he followed up with Verrastro after learning of the November 2006 sale. Verrastro in turn spoke to Durkin, who instructed Verrastro to cancel the policy. Paul Johnson, another Foxco employee, began the cancellation process and understood the date of sale to be December 1st as per the agent. Wallick stated

21

that with respect to the commercial policy, Durkin was the broker as evidenced by letters in the file, invoices directed to him, and the renewal letter. He stated that cancellations always occur through the agents. In this case, Durkin received a commission on the commercial policy only because he was the agent, as identified on the policy's jacket cover.

Further, Insurer called Verrastro, who stated that he had been self-employed as an independent insurance agent since 1989. He described the process by which he earns a commission as follows: the insurer invoices the insured directly, the insured pays the insurer, the insurer remits payment to the agency which takes its commission and remits the balance to Verrastro. Verrastro clarified that he did not set premiums for, collect premiums for, or have any executive decision making authority regarding Foxco. In terms of his position as insurance coordinator for the County, he explained that he served as the origin for the County's insurance policies, through which he ensured that the County knew "what agents had what policies and what those policies basically covered, what they were for, for various locations and basically for effective dates and expiration dates, that there was not a duplication or overlapping coverage." (*Id.* at 1576a.) To that end, he entered the Agreement.

He explained that he did not have decision-making authority regarding the policies, themselves, but stated that he was authorized to convey directives to agencies and insurers based upon instructions provided to him. Because he assumed the role of County insurance coordinator, he was generally barred from acting as an insurance agent for the County, to avoid potential

22

conflicts of interest. However, Wallick was not aware of the limitations placed on Verrastro's authority.

He stated that Durkin was involved with the policies for the Ski Area—both the general liability and commercial policies. He recalled that Durkin advised him he would be the broker on the policies, which Verrastro did not dispute since he was not authorized to act in that capacity. He stated, "Joe [Durkin] was the agent/broker of the Lackawanna County Montage Mountain Ski Policy. That's how—that's how he was addressed. It was his policy. It was his role." (*Id.* at 1599a.) He explained that Durkin had the authority to contact the insurer, make changes to the policy, ensure the policy was serviced correctly, and to cancel the Ski Area policies, where so instructed by the County.

With respect to the commercial policy, Verrastro stated that cancellation could have been directed by the commissioners, chief of staff, risk manager, or the attorney handling the closing. In early December 2006, Verrastro and Durkin learned of the sale, after which Durkin advised Verrastro he would contact Attorney Tressler. Soon thereafter, Durkin reported to Verrastro that as per Attorney Tressler, the Ski Area had been sold and thus, Durkin instructed Verrastro to cancel the commercial policy. Verrastro conveyed the directive to Foxco around late December 2006 or early January 2007. He recalled cancelling other policies pursuant to instructions he received from individuals working on behalf of the County, including a Willis of New Hampshire policy he cancelled in July 2005 as per Risk Manager McCawley and Durkin's directive. Subsequently, Durkin delivered the cancelled commercial policy to Verrastro, who in turn,

23

returned it to Foxco. He testified that upon advising Attorney Tressler of the cancellation, he became infuriated, stating that he did not advise Durkin to cancel anything.

On cross-examination, he admitted that his Agreement did not authorize him to cancel policies on the County's behalf and that with respect to the commercial policy, the commissioners, chief of staff, risk manager, or Attorney Tressler did not specifically authorize him to cancel it.

Insurer next presented the testimony of Charles Volpe, Jr., the President and Chief Executive Officer of Excalibur, who stated that pursuant to Foxco's business model, it dealt with agents and brokers:

> We don't deal with elected officials. We don't deal with their councils or their solicitors or anybody else. We deal exclusively through brokers and agents…. That's just the way it's industry practice and standard.
>
> ***
>
> …We have no dealings on any matters directly with elected officials. Their insurance professional broker representative we believe it's clear and in a way the industry standard or practice, we deal exclusively with them whether it's their consultant, their broker, their insurance advisor, occasionally the risk manager, all of those dealings would occur between [Insurer']s underwriters and those professionals that represent [it] because usually commissioners and mayors, unless they happen to be insurance agent brokers, don't have the first clue about insurance.

(*Id.* at 1734a-1735a.)

He explained that brokers have the authority to bind, place, cancel, endorse, and change policies on behalf of the insureds. He further explained that brokers of record can exist without a writing and always act on behalf of the insureds, not the insurers. With respect to the County, he stated that it was the only entity in the Commonwealth for which Foxco dealt with a different broker on each policy, and hence, he could understand the need for an insurance coordinator. He recalled that the broker with respect to the subject commercial policy was Durkin and stated that he was never informed that Durkin's authority was limited in any way. He recalled that Durkin received commission with respect to the commercial policy only because he was its broker of record.

He testified that after the loss occurred, he had a conversation with Commissioner Cordaro on February 23, 2007, during which Cordaro agreed to handle the loss and asked Attorney Volpe not to inform the press that Durkin had "screwed the thing up." (*Id.* at 1768a.) He reiterated that in late 2006, the policy was cancelled as per Verrastro's directive to Foxco.

On cross-examination, he conceded that the County commissioners never had a meeting to authorize cancellation of the commercial policy. Regarding notice of cancellation, Attorney Volpe stated that it may directed to the first named insured or its authorized representative, although the cancellation endorsement does not specifically state that notice may be sent to a representative. He noted that invoices for premiums on the commercial policy were also sent to Durkin as

25

was the original policy, copies of the policy, the statement of values, and the check returning the unearned premium. Nonetheless, Foxco received the County's payment of premium and other necessary return documents.

Finally, Insurer presented the testimony of Akos Swierkiewicz, Insurer's expert in the field of insurance, insurance underwriting, and claims handling. With respect to the terms "producer," "agent," and "broker," he testified:

> Insurance producer is a term that is used in the industry very loosely or imprecisely and to most insurance people it connotes some intermediary that is involved in handling insurance matters between a policy holder or an applicant for a policy and an insurer. So it's a collective term and it could mean an insurance agent or could mean an insurance broker.
>
> The insurance industries [sic] usage of the term agent refers to an agency relationship between the person that is acting as an agent and the insurance company. They [sic] usually get appointed as an agent to act on behalf of the insurance company.
>
> Broker, the term broker in the insurance industry, is understood a person that acts on behalf of the applicant or prospective insured or the insured and represents them, so in that sense the insurance producer is the collectively [sic] term for both of these functions.
>
> Many times these nice crisp academic distinctions get a little blurred and there is sometimes a dual role played by these intermediaries. They could be acting as both agents and brokers depending on the circumstances. But, you know, that would be what I just said is the insurance textbook and insurance industries [sic] understanding of these terms.

(*Id.* at 1869a-1870a.)

With respect to Durkin, Swierkiewicz opined that his role was blurred between agent and broker but that in either event, he acted on the County's behalf. With respect to broker of record letters, he stated that they are not required and opined that it would be unusual for an insured to provide a broker of record letter where a renewal occurs with the same broker acting as did on the original policy. He emphasized that Durkin's relationship to the County as its broker, was further evidenced by the fact that standard communications to and from the insured and Foxco were addressed to him. He stated that it was industry practice for Foxco to deal with the broker of record rather than to send correspondence to the county commissioners. He explained that generally, brokers' duties involve procuring insurance, selecting the insurer, arranging for payment of premiums, cancelling policies, receiving unearned premiums from cancellations, and obtaining new policies upon cancellation of prior ones.

He described Verrastro's duties as originating all property and casualty insurance policies for the County and maintaining contact with their respective agents. He testified that Verrastro's cancellation of the commercial policy pursuant to Durkin's directive was consistent with the terms of Verrastro's Agreement. Regarding the appropriateness of Foxco's cancellation of the policy under these circumstances Swierkiewicz posited:

> I think it was appropriate simply because this was
> the mod[u]s operandi that was in existence not only in
> this case, but in other—involving other policies, and as I

indicated before, Mr. Verrastro was the point man and he was the primary liaison or contact with [Insurer], [Insurer's] underwriters, so when he received instructions from the broker I think it was reasonable for him to convey that instruction to cancel the policy to the [Insurer's] underwriters and [Insurer's] underwriters were reasonable to assume that this was a proper request.

\*\*\*

[Durkin] was agent and broker and as such he had authority to initiate cancellation of the policy that he was the agent and broker for.

\*\*\*

[H]e had actual authority to do that and if he didn't he certainly got implied and from the bottom of these criterias [sic] apparent authority, but I am—it's my opinion having been in a business for all of these years that he had actual authority to do what he did.

(*Id.* at 1891a-1893a.)

Regarding Foxco's notices of cancellation, he stated that it was more appropriate to send the notices to Insurer's known broker, Durkin, than to direct them to a P.O. Box at a property which Foxco knew was recently sold. Further, with respect to Verrastro's directive that Foxco cancel the policy, Swierkiewicz testified the action was appropriate as per his role as a point person.

On cross-examination, Swierkiewicz acknowledged that as per section A(4) of the cancellation endorsement, Insurer was required to deliver its notice of cancellation to the first named insured's last known address but explained that "in

the circumstances involved in this case what happened the cancellation notice was mailed to the broker, the agent/broker, and that was appropriate under the circumstances." (*Id.* at 1908a.)[5]

## C.

Following trial, the trial court entered judgment in favor of Insurer regarding both the declaratory judgment and breach of contact actions. Specifically, it determined that Durkin was the County's broker regarding the commercial policy, emphasizing that:

> First, he is a licensed insurance agent in Pennsylvania. Second, Mr. Durkin had a broker of record letter signed by Commissioner Cordaro relative to related insurance policies. Third, he received correspondence, invoices, bills and serviced the Montage Mountain policies such securing premium payments and procuring verification of statement of values. Fourth, upon policy cancellation, Mr. Durkin returned related unearned commissions in March of 2009 after the loss occurred. Therefore, this Court finds both legally and factually, Mr. Durkin was the agent/broker solely responsible for acting on behalf of the insured, Lackawanna County, relative to the [Insurer's] Montage Mountain policy and related policies covering the relevant 2006-2007 time frame.

(11/6/2014 Trial Court Order and Opinion, at 15.)

---

[5] Although Insurer also presented the testimony of Gail Hughes, who input cancellation of the commercial policy into Foxco's claim system, her testimony was germane to whether Foxco or Durkin cancelled the policy, and therefore, need not be summarized at length.

Reasoning that as per Verrastro's Agreement, he was under no duty to offer professional advice as to the necessity or appropriateness of coverage, and that doing so was the sole responsibility of the broker assigned to each policy, the trial court determined that offering such advice was Durkin's sole responsibility. To this end, the trial court concluded that following his conversation with Attorney Tressler, Durkin advised Verrastro to cancel the commercial policy and returned the original policy to Foxco, which was in itself tantamount to a cancellation. As such, it held that in cancelling the policy, Durkin acted with *actual* authority because "Mr. Durkin's actual authority would allow such a ministerial nondiscretionary task to occur without further formal authorization given our facts as found in this case." (*Id.* at 42.)

With respect to Section A(4) of the cancellation endorsement, the trial court determined that Foxco did not strictly comply with the provision insofar as it did not send the notice to Insurer's last known address, but rather, forwarded it to Durkin's business address via the January 15, 2007 letter and again by letter dated March 2007. While acknowledging the "technical clerical oversight," the trial court found this error to be harmless since the cancellation process was initiated by the County's agent, Durkin, who had actual notice of the cancellation through the notices of cancellation received in January 2007. (*Id.* at 38.) In other words, while finding the deficiency a technical breach of contract, the trial court held that it did not constitute a material breach and was insufficient to nullify cancellation of the commercial policy.[6]

---

[6] The trial court likewise denied the County's motion for post-verdict relief.

## II.

### A.

On appeal,[7] the County contends that the trial court erred in determining that the County provided Durkin actual authority to cancel the commercial policy. Although the County uses the term "actual" authority, it implies that this phrase is synonymous with express authority.

As an initial matter, we agree with the County that just because an insured authorizes its agent to procure an insurance policy, it does not necessarily follow that the agent is authorized to cancel the policy. Rather, the extent of the agent's authorization depends on the scope of the agency relationship. It is clear that in Pennsylvania, an agent may cancel an insurance policy only where the principal has conveyed actual authority to do so; an agent does not have general authority to cancel a policy merely because he was authorized to obtain the policy. *See Jones v. Dubuque & Marine Insurance Co.*, 176 A. 208, 209 (Pa. 1934) ("An agent who secures a policy of insurance has no general authority to cancel the policy and substitute another therefor unless specifically authorized to do so."); Black's Law Dictionary 143 (8th ed. 2004) (defining "general authority" as "[a] general agent's authority, intended to apply to all matters arising in the course of

---

[7] Our scope of review of a trial court's decision is limited to determining whether the trial court's findings are supported by substantial evidence or whether it has committed an error of law. *Department of Transportation, Bureau of Traffic Safety v. Grutza*, 567 A.2d 784, 786 (Pa. Cmwlth. 1989).

31

business"). To this end, the grant of actual authority may be either express or implied.[8]

As the Restatement (Second) of Agency explains:

> It is possible for a principal to specify minutely what the agent is to do. To the extent that he does this, the agent may be said to have express authority. But most authority is created by implication. Thus, in the authorization to "sell my automobile", the only fully expressed power is to transfer title in exchange for money or a promise to give money. In fact, under some circumstances (see § 53), "sell" may not mean "convey", and there may or may not be power to take or give possession of the automobile or to extend credit or to accept something in partial exchange. These powers are all implied or inferred from the words used, from customs and from the relations of the parties. They are described as "implied authority." Although frequently used, the phrase "express authority" is usually not

---

[8] Actual authority is defined as "[a]uthority that a principal intentionally confers on an agent or authority that the agent reasonably believes he or she has as a result of the agent's dealings with the principal. Actual authority can be either express or implied." Black's Law Dictionary 142 (8th ed. 2004). Actual authority differs from apparent authority, which is defined as "[a]uthority that a third party reasonably believes an agent has, based on the third party's dealings with the principal, even though the principal did not confer or intend to confer the authority. Apparent authority can be created by law even when no actual authority has been conferred." *Id.*

The Insurer, like the County, confuses these phrases, suggesting that apparent authority, in extreme degree, equates to actual authority. (Br. of Appellees, at 26-27 ("A cursory reading of the learned Trial Judge's November 6, 2014 and April 20, 2015 Decisions clearly provide [sic] that Joseph P. Durkin was cloaked with apparent authority to a degree that the learned Trial Judge declared that his authority was 'actual.'")). As discussed above, the concepts of actual and apparent authority are distinct, and the trial judge made no such finding with respect to apparent authority.

adequate to describe the agent's authority, and the use of the adjective "implied" is unnecessary. Both adjectives are to be distinguished sharply from "apparent" as it is used in Section 8, since the latter is distinct in conception, although not in effect as between a principal and third parties. Implied authority as here used is also to be differentiated from a phrase, frequently misused, namely, "authority implied in law," which refers to situations in which a person has power to bind another although not his agent, for example, the power of a wife to bind her husband to pay for necessaries. See § 14I.

The Restatement (Second) of Agency § 7, cmt. c (1958) (adopted by our Supreme Court in *Reutzel v. Douglas*, 870 A.2d 787, 790 (Pa. 2005)). In other words, "[i]mplied agency is actual agency[.]" *Dobbs v. Zink*, 138 A. 758, 759 (Pa. 1927).

While we agree that the record is devoid of evidence showing that express authority to cancel the commercial policy was conveyed to Durkin, we nonetheless affirm the trial court's ruling in this regard as substantial evidence supports its finding that implied authority was conveyed to Durkin. Indeed, implied authority to cancel a policy may be inferred from the agency relationship where a broker is authorized not only to procure insurance, but also to place insurance, to determine the forms and amounts of the policies, and to exercise the "essential authority relative to the [insured]'s insurance." *La France Workshop Lampshade Co. v. Fire Association of Philadelphia*, 171 A. 127, 129 (Pa. Super. 1934).

While it is uncontested that the County did not execute a broker of record letter for Durkin with respect to the commercial policy, substantial evidence

supports the finding that the relationship existed through implication. At trial, Durkin testified that with respect to the commercial policy, he submitted the County specifications, secured a quote which Verrastro approved, helped put the policy together, procured it, and obtained a certificate of insurance as well as the original policy and copies of it. Although he testified at trial that Verrastro's approval of the quote was required, his deposition testimony was contradictory, stating instead that he did not require authority from anyone to select a carrier, accept a particular quote, or procure a policy. Further, his testimony that he required Verrastro's approval runs counter to the language of Verrastro's Agreement specifically providing that Verrastro was not under a duty to provide advice regarding the appropriateness or necessity of coverage, but that that obligation was the sole responsibility of the designated agent for each policy, showing that each policy had but one authorized agent.

Further, Verrastro testified consistent with his Agreement that he did not have decision-making authority regarding the policies, but rather, Durkin was in charge of both the general liability and commercial policy governing the Ski Area. In fact, Verrastro explained that he was precluded from serving as the broker on these policies due to a perceived conflict of interest. As such, Verrastro stated that Durkin was authorized to contact the insurer, make changes to the policy, ensure the policy was serviced correctly, and to cancel it.

Additionally, in his affidavit, Commissioner Cordaro attested that Durkin, in his capacity as broker of record and/or agent for the County, was authorized to select, bind, and cancel the insurance policies for which he served as

34

agent of record. In Durkin's response to an interrogatory, he characterized his own relationship with the County as that of insurance broker/insured.

To this end, the Insurer directed all correspondence to Durkin at his business address rather than to the County directly, including letters, invoices, and the renewal letter, to which the County responded. After the loss, the County directed the cancellation notices, return of premium check, and invoice to Durkin as the County's agent for his unearned commission, all of which Durkin received in the first instance only because he was the agent of record. Moreover, Durkin was assigned an agent number in Foxco's database and was listed on the commercial policy's jacket as the agent. These duties align with those described by Swierkiewicz as typical functions of brokers of record and with industry practices regarding brokers of record.

Additionally, Durkin testified that he attempted twice, albeit unsuccessfully, to cancel the general liability policy for the Ski Area on December 1, 2006 and January 5, 2007. He explained that eventually, the policy defaulted due to nonpayment, because Commissioner Cordaro refused to pay the premium in full. While this testimony relates only to the general liability and not the commercial policy, it evidences an intent on the part of the County to cancel the policy, despite the fact that it covered the Amphitheater—either because the County did not realize the Amphitheater was covered, or in spite of that knowledge. Based on this action that was taken with respect to the general liability policy, the County's argument that it would not have authorized cancellation of the

commercial policy because it still covered the Amphitheater appears meritless, at best.[9]

Still, the County claims that because official action on behalf of the County must be sanctioned by a majority of sitting commissioners at a public meeting pursuant to the County Code[10] and the Sunshine Act,[11] and no evidence was presented that the County Commissioners authorized cancellation of the commercial policy at a public meeting, the cancellation is a nullity.

Specifically, the County relies on Section 1801 of the County Code for the proposition that only County Commissioners may enter into contracts on behalf of the County. However, Section 1801 requires the commissioners to "contract for and purchase all services referred to" in Section 508 concerning personal property for county officers and agencies. 16 P.S. § 1801(a). Section 508 pertains to:

> the office furniture, equipment and supplies, blank books, blanks, dockets, books for records, stationery, postage, fuel, light and janitor and telephone service, required for each of the county officers whose offices are located in

---

[9] We do not dispute that the plethora of case law cited by the County stands for the proposition that a broker lacks general authority to cancel a policy unless specifically authorized to do so. However, for the reasons discussed above, we find substantial support for the conclusion that Durkin had actual authority to cancel the commercial policy. In advancing this argument, the County confuses express authority with actual authority.

[10] Act of August 9, 1955, P.L. 323, *as amended*, 16 P.S. §§ 101–3903.

[11] 65 Pa. C.S. §§ 701–716.

36

the county buildings or at such other places at the county seat as may be designated by the commissioners, and all supplies used by the public in connection with such offices.

16 P.S. § 508(a). Although this provision is obviously inapplicable to commercial property insurance policies, there still must be an authorization to expend funds by entering into contracts to purchase, including the purchase of insurance. When asked at oral argument why such records were not produced, we were informed that such records do not exist because they were destroyed. In any event, the question here is not what authorization is needed to make a purchase, but who may return a purchase via the cancellation of an insurance policy.

The County has failed to offer evidence demonstrating that the County Commissioners may cancel an insurance policy only by official, express action, evidenced in writing, particularly where they have provided actual authority to an agent to act on their behalf. Further, because this argument has failed, so, too, must the County's claim that the cancellation violated Section 704 of the Sunshine Act, requiring official action to take place at a public meeting, since there has been no showing that official action was required in the first instance. 65 Pa. C.S. § 704.

**B.**

Next, the County contends that Insurer breached the commercial policy's cancellation endorsement by failing to provide the County notice of the cancellation at its last known address and instead, directing notice to Durkin at his business address. We agree with the County that the Insurer's actions in this

37

regard constituted a technical breach of contract, regardless of the fact that the Insurer was not required by statute to notify the County of insured-initiated cancellations. However, such a deficiency does not nullify the cancellation because it was an immaterial breach.

A material breach occurs where a breach of contract is "so serious it goes directly to the heart and essence of the contract, rendering the breach incurable." *LJL Transportation, Inc. v. Pilot Air Freight Corporation*, 962 A.2d 639, 641 (Pa. 2009). Under these circumstances, it cannot be said that the Insurer's failure to provide the County direct notice of the cancellation was material. Indeed, as discussed above, the County provided Durkin actual authority to act as its agent with respect to the commercial policy, which included authority to cancel the policy and receive correspondence on the County's behalf. While this does not negate the Insurer's duty to provide notice to the County as per the cancellation endorsement, notice was provided to the individual singularly authorized to handle the policy. Because the cancellation was initiated by the County rather than by the Insurer, the value of notice above and beyond that already provided to Durkin is diminished. Stated otherwise, a material breach did not occur due to the Insurer's failure to notify the County directly of its own cancellation, where the notice of cancellation was sent to its authorized agent.[12]

---

[12] Although separate and apart from Insurer's contractual obligation to notify the County directly of the cancellation, Section 3 of the Act requiring notice of rate increases, policy cancellations and nonrenewals by property and casualty insurers (Act), Act of July 3, 1986, P.L. 396, *as amended*, 40 P.S. § 3403, lends credence to our conclusion that Insurer's breach was immaterial. That provision states that the requirement that a notice of midterm cancellation be
**(Footnote continued on next page…)**

38

Nonetheless, the County argues that cancellation of an insurance policy is effective only where there is strict compliance with the cancellation provisions as per *Harty v. Standard Accident Insurance Co.*, 147 A.2d 421, 423 (Pa. 1959). In that case, our Supreme Court held that where it was disputed whether the insured cancelled his first policy and replaced it with a second or whether he merely procured multiple coverages, the insurer bore the burden of proving cancellation by showing strict compliance with the cancellation provisions. To this end, strict compliance with cancellation provisions is indicative of an insured's intent to cancel.

In the present case, the trial court has already determined that the County cancelled the commercial policy, and the County does not dispute this finding on appeal. Rather than using strict compliance with the cancellation provisions as a gauge of a party's intent to cancel, the County invites us to use it as a procedural ground upon which to invalidate an otherwise valid cancellation it initiated. However, an insured may waive strict compliance with cancellation provisions, even where the cancellation is initiated by an insurer. *See Scott v. Southwestern Mutual Fire Association*, 647 A.2d 587, 590 (Pa. Super. 1994). Indeed, where an insured does not wish to continue a policy, it is free to cancel the policy at any time, provided such a right exists in the policy. *Id.* Here, the County waived the Insurer's need to strictly comply with the cancellation notice provisions

---

**(continued…)**

forwarded directly to the named insured does not apply where the policy was cancelled by the named insured. Section 3(a)(3)(iii) of the Act, 40 P.S. § 3403(a)(3)(iii).

39

because the County cancelled the commercial policy, thereby evidencing its intent not to be bound by it. *See Federal Kemper Insurance Co. v. Insurance Department*, 500 A.2d 796, 800 (Pa. 1985) (holding that because the insured cancelled the policy, the Insurance Commissioner erred in finding the cancellation invalid on the basis that the insurer failed to provide the notice of cancellation statutorily required, which applied only when the insurer canceled or refused to renew a policy).

## C.

Finally, the County argues that pursuant to 31 Pa. Code § 113.86, Durkin's failure to forward the January 15, 2007 notice of cancellation to the County nullifies the cancellation. That provision states:

> § 113.86. Notices of nonrenewal or cancellation forwarded by agents.
>
> An insurer shall be deemed in compliance with the requirement that notices of midterm cancellation or nonrenewal be forwarded by the insurance company directly to the named insured if an agent, who is authorized by an insurer to act on its behalf for purposes of providing notice of midterm cancellation or nonrenewal forwards notices of midterm cancellation or nonrenewal to the named insured. The insurer is responsible for the authorized agent's failure to meet the requirements for providing notice of midterm cancellation or nonrenewal to the named insured.

31 Pa. Code § 113.86.

40

To this extent, the County claims that the Insurer bears the risk of Durkin's failure to forward the January 2007 notice of cancellation to the County. We disagree. First, there was no evidence submitted that Insurer authorized Durkin "to act on its behalf for purposes of providing notice of midterm cancellation" to the County. 31 Pa. Code § 113.86. Rather than being authorized to provide notices of cancellation on the Insurer's behalf, Durkin was authorized as the County's broker to accept such notifications on the County's behalf.

Second, this regulation was issued under the authority of the Act, 40 P.S. §§ 3401–3409, *see* footnote 38, *supra*, and seeks to implement those provisions. Therefore, the "requirement that notices of midterm cancellation or nonrenewal be forwarded by the insurance company directly to the named insured" to which 31 Pa. Code § 113.86 refers is not an independent obligation, but rather the obligation set forth in Section 3(a) of the Act, 40 P.S. § 3403(a). As we stated above, these notice requirements are inapplicable where a policy is cancelled by the named insured. Section 3(a)(3)(iii) of the Act, 40 P.S. § 3403(a)(3)(iii). Therefore, 31 Pa. Code § 113.86 interpreting that provision does not provide the County a basis for seeking invalidation of its cancellation.

Accordingly, we affirm the trial court's order entering judgment in favor of the Insurer and against the County with respect to the Insurer's declaratory judgment action and the County's breach of contract and bad-faith action.

---

DAN PELLEGRINI, Senior Judge

41

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Housing and Redevelopment Insurance Exchange | : | |
| | : | |
| v. | : | |
| | : | |
| County of Lackawanna and Joseph P. Durkin | : | |
| | : | |
| County of Lackawanna | : | |
| | : | |
| v. | : | |
| | : | |
| Dominick Verrastro, Housing and Redevelopment Insurance Exchange and Foxco Insurance Management Services, Inc. and Joseph P. Durkin, Individually and t/d/b/a JD Insurance Consultants | : | |
| | : | |
| Appeal of: Lackawanna County | : | Nos. 867 and 868 C.D. 2015 |

# **O R D E R**

AND NOW, this 31st day of March, 2016, the order of the Court of Common Pleas of Lackawanna County in the above-captioned cases are affirmed.

_____
DAN PELLEGRINI, Senior Judge